## JENKINS PETROLEUM PROCESS CO. v. SINCLAIR REFINING CO.

District Court, D. Maine. August 10, 1928.

No. 816.

Mayer, Meyer, Austrian & Platt and Parkinson & Lane, all of Chicago, Ill., and Philip G. Clifford, of Portland, Me., for plaintiff.

Jones, Addington, Ames & Seibold, of Chicago, Ill., and Verrill, Hale, Booth & Ives, of Portland, Me., for defendant.

PETERS, District Judge. This is a bill in equity brought to compel the defendant to assign to the plaintiff letters patent of the United States numbered 1,285,200, issued to Edward W. Isom November 19, 1918. The plaintiff claims to be entitled to this assignment by reason of a written agreement with the defendant dated October 2, 1916, by which it was stipulated · that the plaintiff should loan the defendant for experimentation purposes a certain apparatus devised by one Jenkins for the purpose of obtaining gasoline and other light oils from heavier hydrocarbons, and that any improvements in its mechanism or in the process that might be thereby developed by the defendant's agents should accrue to the plaintiff.

After the machine had been examined and the proposed new process explained to Isom, an agent of the defendant, he obtained the patent referred to which was assigned to the defendant and which also covered a method of "cracking" hydrocarbons claimed by the plaintiff to be in some respects similar to the Jenkins process and to be derived therefrom. Meanwhile Jenkins has been granted two patents on his process and apparatus, the first patent, the application for which was filed July 13, 1916, being issued May 15, 1917, numbered 1,226,526, and the second, for which application was issued September 27, 1918, being issued November 11, 1919, and numbered 1,321,749.

In order both properly to interpret the agreement and to apply it to the complicated situation which subsequently arose, it is necessary to briefly state the situation of the parties in 1916.

The tremendous increase in number of automobiles and the increasing demand for gasoline had for some years directed the attention of experts toward new processes for obtaining a larger percentage of gasoline from the crude oil taken from the ground. The defendant was largely interested in the oil refining business; having plants in many parts of the country, and had its experts constantly on the alert to note and examine every "cracking" process that came out. E. W. Isom, a son of the president of the defendant company, was specially assigned to this branch of the work and incidentally kept in close touch with the Patent Office. At its plant in Coffeyville, Kan., the defendant had a special row of small buildings for investigating and experimenting with any apparatus which was offered to them and which it was thought or hoped might have merit. There was much competition, and the personnel of the defendant company which came in contact with this branch of the business was eager to find and acquire any process that would increase the percentage of gasoline, formerly discarded as worthless, now the most valuable product of the petroleum.

In the business of cracking oil—meaning breaking up the molecules of the crude oil by heat and pressure into different forms—a distinct evolution can be traced. The first process was practically an iron kettle with a top bolted on, heated very hot, with a vent for the resulting vapor to escape and be condensed.

This was the original "batch" process where one quantity of oil was put in the still and cooked till there was nothing left but a tar-like product, whereupon the apparatus was cooled off and the kettle cleaned out. Gradually the bulk of the oil was removed from the fire, a small quantity being separately heated in tubes connected with the bulk supply tank, oil was added as the process went on, a reflux tower was invented to retreat escaping vapors, various improvements in apparatus were devised, and in different ways the percentage of the distillate increased, but always the carbon formed by breaking down the hydrocarbon molecules was the bane of the industry.

In 1916, Jenkins, a steam power engineer, who gives his name to the plaintiff company, entered the employment of the defendant (then called the Cudahy Refining Company) as a lubricating engineer and became interested in the problem of carbon or coke which was so badly clogging the cracking machines and impeding the progress of the industry. As a result he evolved the so-called Jenkins process and a small experimental still to exemplify it and interested some other employees of the Cudahy Company, who brought the matter to the attention of the elder Isom, president of the company; who directed his son, E. W. Isom, to look into it.

The claims made by the Jenkins people— very strong in their prospectus and in conversation, but rather milder in the application for patents—were in substance that they had a process and a machine whereby formation of carbon was practically eliminated and a continuous stream of petroleum could be carried into the still "and (as described in

the patent) a substantially equal quantity of light, condensable oil, such as gasoline, will flow continuously from that apparatus."

This was revolution. Young Isom and other employees of the defendant went to the garage of Jenkins, with his consent, to have him explain the system and see it work.

He had a small experimental still there. Jenkins explained it to them, but they could not see it work, as in getting up pressure a fire occurred which burned the garage and everything combustible to the ground. However, the Cudahy people were sufficiently impressed so that they wanted to try again under more favorable conditions, and arrangements were made to ship the surviving still to Coffeyville. Whereupon the plaintiff prepared the letter of October 2, 1916, which, accepted by the defendant, constitutes the contract which is the basis of the suit, and is as follows:

"Chicago, Ill., Oct. 2, 1916.
"Cudahy Refining Co., Chicago, Illinois.

"Gentlemen: Pursuant to our conversations and conferences relative to the Jenkins process of treating petroleum, it is understood that we are to loan you our experimental still to be shipped to Coffeyville, Kansas, so that your experts and engineers may have apparatus immediately available upon which to carry out experiments upon the Jenkins improved process upon your petroleum products.

"It is further understood that Mr. Ulysses S. Jenkins of Chicago will go to Coffeyville, Kansas, to install the still and will remain in an advisory capacity throughout the entire course of experimental work carried on by your experts, Mr. Jenkins' salary being $150.00 a month, and all expenses, including railroad expenses incurred by him in making trips to Chicago rendered necessary by said experimental work, this to be paid by you.

"It is further definitely understood and agreed between us that any improvements, whether of a mechanical nature or in the process, which may be developed as the result of the work of your engineers and experts in familiarizing themselves with the Jenkins apparatus and process, shall accrue to the Jenkins Petroleum Process Company, and that you shall so far as you are able to do, cause your employees carrying on such experimental work to execute applications for patents for the United States and any other countries to protect any such improvements, but at the expense of Jenkins Petroleum Process Company and to assign said applications, together with the improvements they are intended to protect, to the Jenkins

Petroleum Process Company. This provision is of course rendered necessary by the fact that in development of a process of this character, and particularly in its application to particular oils, many shortcuts and improvements necessarily are developed by the experts entrusted with the carrying out of the process, which belong by right to their employer, and under the circumstances here involved, of course, to the Jenkins Petroleum Process Company, inasmuch as they are loaning you not only their experimental still, but also the services of Mr. Jenkins, the inventor himself.

"It is further understood that all expenses in connection with the transportation of the still and incidental expenses shall be paid by you, and that as soon as your engineers and experts have carried on sufficient work with this still to thoroughly familiarize themselves with the process and discover the best conditions under which to apply the process to your petroleum products the still will be returned in good condition to us, and that Mr. Jenkins' salary will continue from the time the still is first shipped to Coffeyville until such time as it is returned.

"Yours very truly,
"Jenkins Petroleum Products Co.,
"By A. G. McGuire, President.
"This letter and agreement accepted and approved.
"Cudahy Refining Company,
"By W. H. Isom, Pres."

This letter, which had been prepared for the plaintiff carefully and under the guidance of legal counsel, was handed to the president of the defendant company by one of his submanagers who was helping to finance the plaintiff company, and, very possibly, inconsiderately signed by the defendant's president. But it was signed and the contract made. I do not find that any fraud was perpetrated, but I think it probable that if it had been apparent that the letter emanated from the office of an astute lawyer employed by the plaintiff, the defendant's president would have been more deliberate in his action. I refer to this phase of the matter only because this is a suit in equity to enforce specific performance wherein the court in adjusting the equitable status of the parties has a certain discretion—not absolute, of course, but controlled by the established principles of equity jurisdiction. Hess v. Bowen (C. C. A.) 241 F. 659.

At least it can be said that a harsh, unfair, or unjust interpretation of the contract may be properly refused. Greison v. Winey (D. C.) 226 F. 302.

As the plaintiff claims that under the contract it is the equitable owner of the defendant's patent and the defendant claims that the contract does not and cannot be so construed, it becomes necessary at the outset to establish such an interpretation of the contract as will cover the claims of the parties in this respect.

It should be considered that the defendant's agents knew from the plaintiff's agents and others, from explanation by the inventor, and from visual examination of the experimental still in the Jenkins garage, prior to the date of the letter, what the Jenkins process was claimed to be and how it was supposed to work. It appears that the defendant's people were skeptical of its practicability—they "had to be shown." Also it might work on certain kinds of oil and not with the defendant's oil. Then came the suggestion to ship the still to the well-equipped plant of the defendant for experimentation and the letter defining the subsequent rights of the parties.

The purpose of the loan of the still was expressed to be, "so that your experts and engineers may have apparatus immediately available upon which to carry out experiments upon the Jenkins improved process upon your petroleum products."

That this was a contract in which experimentation and knowledge to be derived from experiments was in the forefront of the minds of the parties is further shown by the wording in the last clause, "as soon as your engineers and experts have carried on sufficient work with this still to thoroughly familiarize themselves with the process and discover the best conditions under which to apply the process to your petroleum products, the still will be returned," etc.

To carry out the desire of both parties that defendant should work and experiment with the still is clearly expressed to be the purpose of the agreement. The detail of providing for payment of expenses was fully provided for.

There remained one other matter to be covered—the possibility that the defendant in the course of its investigation of this process which was contemplated might discover some improvement in the Jenkins process which it would appropriate to its own use. That danger was described thus, when the parties were more polite to each other than they are now: "In development of a process of this character, and particularly in its application to particular oils, many short-cuts and improvements necessarily are developed by the experts entrusted with the carrying out of the process, which belong by right to their employer, and, under the circumstances here involved, of course, to the Jenkins Petroleum Process Company, inasmuch as they are loaning you not only their experimental still, but also the services of Mr. Jenkins, the inventor, himself."

Consequently it was provided that, "any improvements whether of a mechanical nature or in the process, which may be developed as the result of the work of your engineers and experts in familiarizing themselves with the Jenkins apparatus and process shall accrue to the Jenkins Petroleum Process Company," and, "you shall so far as you are able to do so, cause your employees carrying on such experimental work to execute applications for patents * * * and to assign such applications, together with the improvements they are intended to protect, to the Jenkins Petroleum Process Company."

The question is, of course, what improvements and how conceived are covered by the contract and, specially, whether the improvements in the art of cracking oils described in the Isom patent, owned by the defendant, are such as were contemplated by this contract.

If knowledge gained by experimentation alone is the only knowledge covered by the contract, the result is clear, because no experiments were ever made or witnessed by the defendant's people; the Jenkins people never being able to make the still work after they began to show it to the defendant's people, and it being apparently abandoned by all parties and left as an orphan still until it appeared in court with remains of birds' nests in the drum.

While I think that a narrow construction of the contract confining the improvements to such as were developed by experts while making the contemplated experiments with the machine (which were never made) may be justified, I prefer to further consider the status of the parties under a broader construction which gives more weight to the words "familiarizing themselves with the Jenkins apparatus and process," especially as the plaintiff claims that the defendant's agents artfully and designedly gained the confidence of the Jenkins people, extracted all their information and used it as the basis of the Isom patent.

Taking the broader construction of the contract it would embrace information concerning the Jenkins process imparted in any way by the Jenkins people to the defendant's experts, and it appears from the evidence

that much information was given by way of plans, specifications, and descriptions, and without doubt the defendant's experts in this and other ways "familiarized themselves with the Jenkins apparatus and process" as much as possible. I do not, however, find from the evidence that there was any fraudulent intent in so doing, and much of the descriptive information acquired by the defendant's people was not received by them exclusively, but, like the description in the plaintiff's prospectus, shared with the public or with others.

■ So we come to the question whether, in the Isom patent, there are "any improvements, whether of a mechanical nature or in the process" of Jenkins, and, if so, whether they were developed by reason of the familiarity of Isom with the Jenkins process and apparatus. If so, the benefit of them must somehow "accrue" to the plaintiff.

It should not be overlooked that this is not a so-called patent suit. No infringement is in question. Another remedy would exist for that. We are not concerned with the validity of either patent. It is a question of what the defendant has that belongs to the plaintiff under the contract. This depends to some extent on the meaning of the word "improvements" as used in the contract. It is my view, taking into consideration all parts of the contract and the situation of the parties at the time, that it means improvements in this particular Jenkins process, something that would cause the apparatus used in that process to function more efficiently, not an improvement in the general cracking art. An improvement "on" the process would be a better process. This was not intended. It must be an improvement "in" the process. It must be the same process or the same machine but working better by reason of the suggested change.

If Isom invented a different and better process for cracking oil, it would have no connection with Jenkins' process, under this contract, and could not be regarded as an improvement in the Jenkins process. American Cone & Wafer Co. v. Consolidated Wafer Co. (C. C. A.) 247 F. 335.

■ The Isom patent would have to be shown to consist mainly at least of improvements in the Jenkins process to entitle the plaintiff to an assignment of it under the contract; whereas, a study of the numerous alleged improvements which the plaintiff relies upon shows that they are either essentials of the new invention of Isom or that they originated and were taken from the prior art shown at the trial.

Isom bases his claim to an independent invention principally upon his upright tubes, which are absent from the Jenkins apparatus.

The two processes are far more distinct than is Isom from the prior art which he is shown to have been familiar with.

Jenkins had his new and distinctive features of continuous operation without deposit of carbon, mass action, selective take-off from stratified gases and circulation of his whole mass of oil like a river. Isom operates on exactly the opposite principles, based on the prior art. He provided for carbon and shut down to remove it, had nothing like a selective take-off and did not consider that the gases would stratify, his circulation was of a small part of the bulk, and his general process on the principles of Benton and Clark. His invention was not an adoption of the new theories of Jenkins, but in its main features an independent invention. It was an improvement in the prior cracking art having little relation to Jenkins.

The plaintiff's counsel has introduced a specification of seven points or features which he calls "probable improvements" in the Isom apparatus and belonging to the plaintiff under the contract. A careful study of them satisfies me that they are all either features of independent invention or adaptions of prior art, and that the plaintiff has shown no title to them.

This applies as well to the other seven points which the plaintiff claims the defendant has set up as improvements and is estopped to deny that they are such.

I cannot see that any such estoppel can apply in this case, but in any event the last seven points stand in the same position relative to the Jenkins process, the prior cracking art, and previously devised apparatus as do the seven previously referred to. They are utilizations of features in structures prior to Jenkins and independent of him.

The plaintiff's case is based largely on showing that Isom had the opportunity to get the ideas for his improvements, his company the disposition to commandeer them, and that the result shows their adaptability to Jenkins. This will not avail when other prior art processes previously known to Isom, and to which his improvements are equally adaptable, are laid down beside them.

It must be made to appear that the features in question are something in the nature of "short-cuts and improvements" in the Jenkins process to give the plaintiff a standing. Short-cuts and improvements in the prior art will not be sufficient.

If it should appear that features of the

Isom patent were usable or valuable as short-cuts or improvements in the Jenkins process the plaintiff must proceed further and show that they were the result of the "work of (defendant's) engineers and experts in familiarizing themselves with the Jenkins apparatus and process." It must appear that Isom's ideas were obtained from the Jenkins disclosures.

An immense amount of evidence was put in relative to the source from which Isom drew the inspiration for his invention. It is not desirable or possible to even summarize it here. Isom himself was on the stand for about a week. He testified definitely and in detail of his prior conception of his invention. It developed that he had investigated and studied oil cracking processes for some years, that being his business, and in the course of his work acquired information as to 30 or 40 different systems. His principal object was to solve the carbon problem.

He described in detail systems with which he was familiar prior to Jenkins, such as Benton, Clark, Seeger, Smith, and many others, several of which had features which were manifestly the ancestors of the ideas incorporated into the Isom patent. He testified that in the spring of 1915 he finally got the conception of the invention which was finally embodied in the Isom patent, and that later in that year he made a disclosure of it to his father, and he is to some extent corroborated in that. This was more than a year prior to any knowledge of the Jenkins process. In the fall of 1916, after he had knowledge of the Jenkins process, he built an experimental still to illustrate his patent. In regard to his contact with Jenkins I incline to the theory that Isom got all the information he could about the Jenkins process and turned it down as impracticable. He never saw the apparatus work and did not believe it would work. He returned to his preconceived ideas based on Clark and others prior to Jenkins and went ahead with his invention which was the outgrowth of those ideas.

I am of the opinion from the evidence that Isom conceived the principal features of his invention before he heard of Jenkins and that nothing material was added to his knowledge of the art after he investigated the Jenkins process. The features of the Isom patent in the nature of improvements could well be the outgrowth of patents and processes shown to have been within the knowledge of Isom before any of the Jenkins process was disclosed.

To permit the plaintiff to acquire the Isom patent upon the showing made here, not to mention the disparity of consideration which must be apparent, would be inequitable and unjust, and I cannot think that it should be permitted.

Several other defenses have been urged by industrious counsel which I have not found it necessary to consider.

The result is that the bill must be dismissed, with costs.