## JENKINS PETROLEUM PROCESS CO. v. SINCLAIR REFINING CO.

Circuit Court of Appeals, First Circuit.
April 9, 1929.

No. 2203.

Henry Russell Platt and Wallace R. Lane, of Parkinson & Lane, both of Chicago, Ill. (Philip G. Clifford, of Portland, Me., on the brief), for appellant.

Isaac B. Lipson, of Chicago, Ill., and Frank E. Barrows, of New York City (W. Clyde Jones, J. Bernhard Thiess, and Arthur B. Seibold, all of Chicago, Ill., Dean S. Edmonds, of New York City, and Charles D. Booth, of Verrill, Hale, Booth & Ives, of Portland, Me., on the brief), for appellee.

Before JOHNSON and ANDERSON, Circuit Judges, and MORRIS, District Judge.

JOHNSON, Circuit Judge. This is an appeal from the District Court of the United States for the District of Maine. 32 F.(2d) 247.

A statement of facts is necessary to a consideration of the questions which have been raised. The Jenkins Petroleum Process Company will be referred to as plaintiff, and the Sinclair Refining Company as defendant.

The plaintiff is a corporation organized and existing under the laws of the state of Wisconsin; the defendant, a corporation organized and existing under the laws of the state of Maine. The latter was originally organized and known as the Cudahy Refining Company. Its name was later changed to that which the defendant bears. The business of the Cudahy Refining Company, which was continued by the defendant, was in part to treat petroleum products. The plaintiff was organized for the same purpose and acquired the ownership of an invention of Ulysses S. Jenkins and letters patent of the United States No. 1,226,526 issued to him on May 15, 1917, and letters patent No. 1,-321,749 issued to him on November 11, 1919. The former was for a process patent and the latter an apparatus patent.

The process relates to the distillation of crude oil to obtain gasoline, and is called a "cracking process" in distinction from "straight distillation." By the latter crude oil as it comes from the well is heated to different temperatures, the vapors from which gasoline is derived coming off at one temperature and those forming kerosene and gas oil coming off at other temperatures. The lighter oils which yield gasoline, the most valuable product of the "cracking process," contain fewer atoms of hydrogen and carbon to the molecule than the heavier oils which yield other products. By the "cracking process" the crude oil is subjected to a high degree of heat to break up the molecules of the heavier oils into smaller molecules to form lighter oil before they are distilled over. In order to do this it is necessary to prevent the escape of gases and vapors in order that the distillation may not take place before a temperature is reached at which the molecules are disrupted or broken up.

At the time with which the present case is concerned, "straight distillation" had been employed, by which the refiners were not able to obtain more than 30 to 35 per cent. of the amount of the oil as gasoline, and in the attempts that had been made to obtain gasoline by the "cracking process" a great deal of carbon was deposited in the still which adhered to its sides, interfering with the proper heating of the oil and producing other results which caused the bursting of the still. It then became necessary to shut down the process and let the still cool so that the carbon which adhered to its walls might be removed and it again be heated to the temperature required for the "cracking process."

Experts in the refining process were devoting their knowledge and skill to discovering some method for the elimination of carbon. Two methods were in use at this time: One, called the Burton method, by which a still was charged by oil pumped into it and then heated; another, devised by different inventors, was a tube method by which the oil was heated in tubes instead of in a still. Various inventions by Clark, Seeger, Smith, and Cross employed the tubular method.

The demand for gasoline had largely increased and the "cracking" art was the subject of a great deal of study. Ulysses S. Jenkins, to whom the patents before mentioned were issued, was in the employ of the defendant in its lubricating sales department. He had had experience with steam boilers, but, knowing that there was serious trouble with the "cracking process" due to the formation of carbon, turned his attention to inventing a still for "cracking" oil, and set up one in a small garage in Chicago.

Others became interested with him and prospectuses were issued, when his experimentation had gone far enough to justify it. These were distributed to the public and particularly to oil refiners.

The striking feature of his method and apparatus set out in the prospectus issued was that the process could be made continuous by new oil being pumped into the still continuously and the desired products obtained by an indefinite running of the still, so that it would not be necessary to stop the process to clean the carbon from the still before a fresh charge of oil could be put into it. Inclined boiler tubes were shown through which the oil was driven, and it was claimed that by this method "coking, the bane of practical oil men, which is responsible for more trouble, inefficiency, burned bottoms, ruined stills,

and spoiled product, than any other single cause, is absolutely done away with. Our stills if properly operated, need practically never be cleaned except to remove the small percentage of impurities which may be carried in with the oil." The prospectus then pointed out how the oil circulating rapidly through the inclined boiler tubes would gather the maximum of heat, being "seventy-five per cent. as high as that of the flames." It then pointed out other advantages of the method, including the gas take-off so adjusted as to take off the gases generated, which would arrange themselves according to various densities by what was known as "mass action." Reference was made to the demonstration of Dr. Rittman, connected with the United States Bureau of Mines. These prospectuses were issued and came into the possession of the Cudahy people in the fall of 1916.

The defendant in the meantime had been studying methods for cracking oil since 1912, through its engineer, Edward W. Isom, in charge of its refining plants. He had visited different places as described in the record and examined the methods used in refining oil and the cracking processes there.

Mr. William H. Isom was the father of Edward W. Isom and the president of the defendant company. It was brought to his attention in 1916 that Jenkins claimed to have invented an apparatus for cracking oil which eliminated the carbon practically and that it would run continuously and "revolutionize the oil industry." He communicated with his son, Edward W. Isom, who came to Chicago, and arrangement was made to visit the garage where the Jenkins apparatus had been set up. He did so, but the apparatus did not work, and a fire soon after put it out of commission. This was in August, 1916.

Edward W. Isom saw the Jenkins apparatus but once in Chicago. He thought that different oil should be used and wanted to try it upon the oils of the defendant company. He therefore made a suggestion to the officers of the plaintiff company that they ship the still to Coffeyville, Kan., where the defendant had a plant. Following this a letter was written by the plaintiff, as follows:

"Chicago, Ill., October 2, 1916.
"Cudahy Refining Co., Chicago, Illinois.

"Gentlemen: Pursuant to our conversations and conferences relative to the Jenkins process of treating petroleum, it is understood that we are to loan you our experimental still to be shipped to Coffeyville, Kansas, so that your experts and engineers may have apparatus immediately available upon which to carry out experiments upon the Jenkins improved process upon your petroleum products.

"It is further understood that Mr. Ulysses S. Jenkins of Chicago will go to Coffeyville, Kansas, to install the still and will remain in an advisory capacity throughout the entire course of experimental work carried on by your experts, Mr. Jenkins' salary being $150.00 per month, and all expenses, including railroad expenses incurred by him in making trips to Chicago rendered necessary by said experimental work, this to be paid by you.

"It is further definitely understood and agreed between us that any improvements, whether of a mechanical nature or in the process, which may be developed as the result of the work of your engineers and experts in familiarizing themselves with the Jenkins apparatus and process, shall accrue to the Jenkins Petroleum Process Company, and that you shall so far as you are able to do, cause your employees carrying on such experimental work to execute applications for patents for the United States and any other countries to protect any such improvements, but at the expense of Jenkins Petroleum Process Company and to assign said applications, together with the improvements they are intended to protect, to the Jenkins Petroleum Process Company. This provision is of course rendered necessary by the fact that in the development of a process of this character, and particularly in its application to particular oils, many short-cuts and improvements necessarily are developed by the experts entrusted with the carrying out of the process, which belong by right to their employer, and under the circumstances here involved, of course, to the Jenkins Petroleum Process Company, inasmuch as they are loaning you not only their experimental still, but also the services of Mr. Jenkins, the inventor himself.

"It is further understood that all expenses in connection with the transportation of the still and incidental expenses shall be paid by you, and that as soon as your engineers and experts have carried on sufficient work with this still to thoroughly familiarize themselves with the process and discover the best conditions under which to apply the process to your petroleum products, the still will be returned in good condition to us, and that Mr. Jenkins' salary will continue from the time the still is first shipped to Coffeyville until such time as it is returned.

"Yours very truly,
"Jenkins Petroleum Process Co.
"By A. G. Maguire, President."

This letter was approved and accepted by the Cudahy Refining Company through W. H. Isom, its president.

Pursuant to this agreement, the experimental still was shipped to Coffeyville, and Mr. Jenkins, the inventor, went there to set it up and give instructions to the engineers of the defendant. Employees of the defendant assisted, under the supervision of Jenkins, in installing the still, which was tested with water and found to leak. After several attempts to weld it together, and after bricking it in and testing it out with water, it was found impossible to make it water-tight. No test was made with oil, which would be a more severe and dangerous test. After discovering the experiments to be futile, Jenkins in November left for Chicago without notice to any one that he was leaving. No experiments with oil were attempted and nothing further was done with the still. It was later sent to the defendant's storehouse, where it remained until produced at the trial.

The defendant, through its patent attorneys, made an investigation of plaintiff's patent application, and upon their report, which was adverse, negotiations were dropped.

The plaintiff, however, attempted to sell licenses to other oil refiners and made one license agreement with the Consumers' Company, September 21, 1916, prior to the date of the letter which is the basis of this suit. Plaintiff had also, in August, 1916, started to design a commercial still at Milwaukee, Wis.

It is contended by the defendant that its experts and engineers learned nothing from experimentation on the plaintiff's still, as there was none, and that all that it disclosed had been made public by the statements in the prospectus which had been issued.

E. W. Isom continued his experimental work and researches in regard to the cracking of oil, and later applied for a patent which was granted by the United States November 19, 1918, on an application filed September 10, 1917.

The defendant has erected a large number of plants at great expense in which the apparatus described in the Isom patent is used.

It is contended by the plaintiff that this patent is only an improvement which results from information obtained by Edward W. Isom from the plaintiff, or obtained by the employees of the defendant by an inspection of the Jenkins still. In its bill the plaintiff has prayed for specific performance of the contract made with the defendant by the letter of October 2, 1916, and its acceptance, and asks for a decree directing the defendant to assign and transfer to it the letters patent issued to Edward W. Isom November 19, 1918, with all rights thereunder, and any and all patents in other countries or applications therefor relating to said improvements and invention; and that the defendant be required to disclose to the plaintiff the result of any and all experiments, tests, and operations made or attempted by it or any of its experts, engineers, agents, employees, and servants after October 2, 1916, relating to the process or apparatus described or disclosed in the patent to Jenkins; and that the defendant be required to account to the plaintiff for all profits which have accrued to it or to the Sinclair Consolidated Oil Corporation, of which it is alleged to be a subsidiary, arising out of the use of the process described in the Isom patent; and also be enjoined from using any of the processes, inventions, and improvements described in the Isom patent; and that the defendant further be required to account to the plaintiff for damage which it has sustained by virtue of the violation of the contract of October 2, 1916.

The contention of the defendant is that the Isom patent of November 18, 1918, was conceived by the said Isom prior to any transactions whatever between Isom and Jenkins, and that the patent issued to Isom was not an improvement upon, in, or to the Jenkins experimental still or the alleged Jenkins process, but that it is radically different from either of these inventions and embodies a wholly different idea of means, operates upon different principles, and accomplishes different and highly successful results. It also contends that the discovery, inventions, and processes of the Jenkins patents which are alleged to have been disclosed to the defendant, or as set forth in them, are not discoveries or inventions in the meaning of the statute of the United States, but consist of mere adaptations to required uses of what was well known in the art, and involved only mere mechanical skill.

A large amount of testimony was taken in the case, which comes to us in a very extended record, but the gist of the case is whether there was sufficient evidence that the Isom patent was the result of information furnished to E. W. Isom, or obtained by any officers of the defendant company in "familiarizing themselves with the Jenkins apparatus and process," to ground a decree for specific performance in the exercise of a judicial discretion by the District Judge.

Of the contract the Judge of the District Court, in his opinion, says:

"While I think that a narrow construction of the contract confining the improvements to such as were developed by experts while making the contemplated experiments with the machine (which were never made) may be justified, I prefer to further consider the status of the parties under a broader construction which gives more weight to the words 'familiarizing themselves with the Jenkins apparatus and process,' especially as the plaintiff claims that the defendant's agents artfully and designedly gained the confidence of the Jenkins people, extracted all their information and used it as the basis of the Isom patent.

"Taking the broader construction of the contract it would embrace information concerning the Jenkins Process imparted in any way by the Jenkins people to the defendant's experts, and it appears from the evidence that much information was given by way of plans, specifications, and descriptions, and without doubt the defendant's experts in this and other ways 'familiarized themselves with the Jenkins apparatus and process' as much as possible. I do not, however, find from the evidence that there was any fraudulent intent in so doing, and much of the descriptive information acquired by the defendant's people was not received by them exclusively, but, like the description in the plaintiff's prospectus, shared with the public or with others."

The hearing before the District Judge occupied about three weeks, one of which was taken up with the examination of Edward W. Isom. He testified at length, both in direct and cross examination, in reference to the investigation which he had made of cracking processes—in the Burton still in 1912, the Wells process in 1913, the Kelsey process in 1914, the Clark process in 1914, and the Seeger process in 1915—also that he visited various refineries and studied their methods, particularly those where the Seeger cracking process was employed. That he was favorably impressed with the process of heating the oil in tubes is shown by a letter to his father under date of April 24, 1915, part of which is as follows:

"The cheapest installation, and the best one, I am sure, will be the tube system, although it may take some time to develop. I will have the estimate and general layout of the equipment I propose ready next week; I am sure of getting results with this equipment, in case we go ahead with it. It eliminates all the faults of various tube processes, all of which are in themselves partially successful, and so has a fair chance of success.

The only way to know is, of course, to try it out."

He also testified that he was familiar with all the literature that had been written in regard to cracking processes.

Of his testimony the District Judge said:

"An immense amount of evidence was put in relative to the source from which Isom drew the inspiration for his invention. It is not desirable or possible to even summarize it here. Isom himself was on the stand for about a week. He testified definitely and in detail of his prior conception of his invention. It developed that he had investigated and studied oil cracking processes for some years, that being his business, and in the course of his work acquired information as to thirty or forty different systems. His principal object was to solve the carbon problem.

"He described in detail systems with which he was familiar prior to Jenkins, such as Benton, Clark, Seeger, Smith and many others, several of which had features which were manifestly the ancestors of the ideas incorporated into the Isom patent. * * * I incline to the theory that Isom got all the information he could about the Jenkins process and turned it down as impracticable. He never saw the apparatus work and did not believe it would work. He returned to his preconceived ideas based on Clark and others prior to Jenkins and went ahead with his invention which was the outgrowth of those ideas."

■ There was evidence that certain admissions were made on the part of the defendant which was denied, so that the evidence in regard to them was conflicting. This testimony was all oral, and the finding of the presiding judge in regard to it is conclusive.

■ That Isom made his invention from what was disclosed by Jenkins rather than from knowledge gained from his own experimentation, the prior art, and from all that had been disclosed by prior patents, is not in our opinion so clearly shown as to ground a decree for specific performance.

It is contended by the defendant that the contract of October 2, 1916, should be confined to information obtained from experimentation with the Jenkins still after that date, but giving to the contract the broad construction placed upon it by the District Court, it is impossible to determine from a careful study of the record whether the invention of Isom was the result of information which had been obtained by the defendant's "engineers and experts familiarizing them-

selves with the Jenkins apparatus and process," or whether it was the result of Isom's inventive genius and of information obtained from other sources which were open to Isom as fully as to Jenkins.

To sustain a decree of specific performance the contract not only should be clear and unambiguous, but the evidence in relation to acts alleged to have been done under it and necessary to give it effect should be clear and convincing.

Failing such evidence, the parties must be left to their equitable or legal remedies; the bill must be dismissed without prejudice and without costs.

The decree of the District Court is modified in accordance with this opinion, and so modified is affirmed, without costs.