## MULLINS MFG. CO. v. BOOTH,

### No. 8765.

Circuit Court of Appeals, Sixth Circuit.

Feb. 10, 1942.

of Canton, Ohio, and Frank E. Liverance, Jr., and Lloyd C. Root, both of Grand Rapids, Mich., on the brief), for appellant.

J. Thomas Smith, of Detroit, Mich. (Arthur C. Beaumont, of Detroit, Mich., on the brief), for appellee.

Before SIMONS, ALLEN, and McALLISTER, Circuit Judges.

SIMONS, Circuit Judge.

Begun by bill for specific performance of a contract for the assignment of patent rights by the inventor to a manufacturer, the controversy revolves about the construction and scope of the contract and the right of the plaintiff to the relief prayed. The court dismissed the bill and granted an injunction upon the cross-bill, restraining the plaintiff from interfering with the defendant's enjoyment of the inventions involved.

The appellant is a manufacturer at Salem, Ohio, engaged in the stamping of sheet metal and the fabrication of sheet metal products, including evaporators for refrigerating devices. The appellee had invented an improvement in a refrigeration evaporator and float valve assembly to be made of sheet steel, and prior to May 1, 1930, had applied for patents thereon. He negotiated with the appellant, with the result that the latter, after investigation, entered into a contract with him, by the terms of which the patent applications were assigned to the appellant and ripened into patents Nos. 1,893,321 and 1,798,652, subsequently reissued as reissue patents Nos. 19,136 and 18,182. In the preamble to the contract is expressed the desire of the appellant to obtain the inventions specifically referred to, "and any improvements or additions thereto." Though no specific covenant appears in the body of the instrument expressly obligating the inventor to assign future inventions or subsequently granted patents, to the manufacturer, there are, however, incidental references to improvements [1] from which, it is argued, that the

Harry W. Lindsey, Jr., of Chicago, Ill. (Harry Frease, of Canton, Ohio, Harry W. Lindsey, Jr., of Chicago, Ill., Joseph Frease,

---

[1] 8th: This license agreement shall remain in force throughout the term of any and all patents coming within this agreement as a result of applications for Letters Patent, or any re-issues, to be filed for said inventions *and improvements thereon* unless otherwise terminated as herein provided for.

13th: It is further agreed that Mullins shall have the right to grant sub-licenses under this agreement and to make, use and/or sell evaporators and float valve assemblies or other devices utilizing the aforesaid inventions or *any improvements thereon*, and that Mullins shall be responsible to Booth for the payment of royalties thereon the same as if made and sold by Mullins.

16th: It is further agreed that all expense in connection with the preparation and prosecution of applications covering the aforesaid inventions relating to evap-

clear intention of the parties to the instrument was that all later inventions relating to refrigeration evaporators are within its scope and that the contract imposes upon the inventor an obligation to assign when and if patents therefor issue.

Between December, 1932, and October 3, 1934, Booth conceived of a new way of making evaporators by extruding metal. This he explained to representatives of the appellant and to the patent attorney who had acted for both parties in the original patent proceedings, and he was asked to expound his concept to the appellant's chief engineer so that an investigation might be made to determine whether there was merit in the new idea. Booth insisted, however, that he would have to have a new financial arrangement, and it was agreed that he should be reemployed by the appellant for a period of sixty days at a stated salary, plus expenses, Booth having been earlier employed but released in the exercise of an option contained in the agreement. The appellant made careful investigation of Booth's invention for a period of 58 days; found two difficult problems involved, one, a welding problem, and the other a problem of securing extruded metal in sufficient quantities and at a price permitting profitable manufacture in a competitive market.

On November 15, 1934, a report was made by the vice-president of the appellant, to the effect that while Booth's idea was attractive, it was impractical from a manufacturing standpoint; involved prohibitive expense, and a process so costly that the matter was closed so far as Mullins was concerned, unless Booth could think of something else. On November 30th, two days before the expiration of the agreed investigatory period, Mullins' chief engineer reported that aluminum could not be extruded with holes; that it was impossible to extrude a section having a plurality of holes; that the cost was prohibitive; that

the invention was no improvement over the existing method practiced by Mullins; and that Mullins was not interested in acquiring the invention. Thereupon, Mullins advised Booth that his invention was not practical; that it did not want it; and that he would be removed from the payroll.

Shortly thereafter, however, Mullins undertook a further investigation, and Booth was restored to the payroll at an increased salary. In December it was determined that the Bohn Aluminum and Brass Company could extrude metal in sufficient quantities, and at an appropriate price. Sample evaporators were made embodying Booth's invention and an effort was made to induce the principal manufacturers of refrigerators to contract for the new evaporators, but without success. On July 18, 1936, Mullins notified Booth that because his evaporator was not acceptable to the trade he would be released from the Mullins payroll, and Booth left Mullins' employ on August 1st. Late in 1939 the Bohn Aluminum Company put upon the market an extruded aluminum evaporator, whereupon Mullins demanded an assignment of the patent, and failing to obtain it, began the present suit praying for specific performance and asserting Booth's obligation to assign the patent to it as one for an improvement on the patents referred to in the 1930 contract and so coming within its scope.

The court found that Booth had verbally offered his invention to the plaintiff; had allowed it sixty days within which to investigate and determine whether it wanted it as provided in the agreement; [2] and that prior to the expiration of the period, Mullins had definitely rejected the invention and that it was immaterial whether Booth had offered it under the terms of the contract or as the subject matter of a new contract, and that Booth was definitely released from his obligation to assign under the original agreement. It further found that

---

orators, float valve assemblies or other devices for household and commercial refrigeration and the methods in connection therewith and *any improvements made thereon by either party to this agreement,* shall be paid for by Mullins and shall come within the terms of this agreement and Booth further agrees to have such applications diligently prosecuted to fully protect Mullins in its monopoly.

17th: It is further understood and agreed that Mullins shall have the right to apply for foreign patents upon said

devices covered by this agreement *or any improvements thereon.*

[2] In the event after Booth has formally offered in writing to Mullins certain refrigeration devices which he thinks should be patented and Mullins declines to accept said offer within sixty (60) days, then Booth is free to apply for said patents at his own expense and to use said patents as he may desire and may dispose of said patents without any claim of Mullins whatsoever.

Mullins had never accepted the invention, and had manifested no interest in it from July, 1936, to late 1939, when the Bohn Company came out with its evaporators. It concluded, as a matter of law, that the extruded evaporator was a new invention, entirely separate and distinct from the inventions covered by the contract; that it was not for a mere improvement upon the inventions referred to therein; and that none of its claims read upon any of the claims in the original patents. It concluded, therefore, that the agreement of May 1, 1930, did not impose an obligation on Booth to assign his inventions upon the extruded metal evaporator or upon the heat exchange unit, and that in any event the controversy between the parties as to the construction and scope of the agreement, having begun in October, 1934, and no sufficient excuse appearing for the plaintiff's delay in bringing suit until February 19, 1940, Mullins was barred by laches from the equitable relief for which it prayed.

For an understanding of the nature of the controversy as to the scope of the original agreement, it is necessary to know that the sheet metal evaporator, invented by Booth prior to May 1, 1930, was not a basic invention for an evaporator, but was for a mere improvement over the prior art. It related to a sheet metal evaporator manufactured by a new process, whereby a piece of flat rolled steel was placed in a press or stamping machine and corrugated, the corrugated sheet being then superimposed upon a piece of flat sheet metal, and the contact points welded so that the corrugations became tubes through which the refrigerants were to pass. From this sheet was also formed the header and the sheet was then folded to shape to form the evaporator.

Booth's 1934 invention for extruding metal to make an evaporator departed from this practice. A billet of metal is heated to a plastic state, placed in a die contained in a hydraulic press, the shape of the die being the shape of the wall structure. Pressure is then applied to the billet to force the plastic material through the die to form the sections in one piece with the conduits therein.

■ The first question is whether Booth's second invention was an improvement upon the inventions that formed the subject matter of the original contract. Booth did not invent the refrigerator as such—that was old in the art. He did invent a sheet metal evaporator with walls formed by a doubled sheet of steel within which, by the superimposing of a corrugated sheet upon a flat sheet, are the passages for the circulation of refrigerants, rendering unnecessary other expedients to provide for their circulation. In its broadest sense the term "improvements" is all-inclusive, and if used broadly would comprehend any advance in the art. But Booth did not undertake, nor does the appellant go so far as to argue that he did undertake, to assign to Mullins all future inventions dealing with refrigerator elements. Courts of equity are loath to give their aid by construction to a contract, the enforcement of which will constitute a mortgage for life on the inventor's brain, and bind all his future products. Independent Electric Co. v. Jeffrey, C.C.Ohio, 76 F. 981; Aspenwall Manufacturing Co. v. Gill, C.C.N.J., 32 F. 697.

Nor did Booth invent the evaporator per se. Had he been a pioneer in this branch of the art, it might, with more persuasiveness, be argued that any invention Booth might later make dealing with evaporators which produced a new result or contributed to speed or economy of manufacture, might be an improvement. But Booth's original inventions were confined to narrow compass, they were of sheet metal evaporators of definite and precise form, and fabricated as the result of a carefully defined process. Had he thereafter made an invention in the more limited field of sheet metal evaporators, such invention might well have been considered an improvement upon the inventions covered by the agreement.

■ That Booth, in his earlier applications and patents, was concerned with a sheet metal evaporator, and that that is what Mullins sought and obtained, is not only clearly demonstrated by the situation and practices of the parties, but by the contract itself. Mullins was engaged in manufacture or assembly, or both, of sheet steel products. These were the result of the commonly known "stamping processes." Mullins was fully equipped to manufacture the original Booth evaporator. It was neither equipped for nor experienced in extruding metal. The problems presented by Booth's later invention, in bringing commercial realization to Booth's inventive concept, were not problems that could be or were solved by Mullins. But aside from this, the recitals in the contract itself clearly indicate what Mullins expected to receive, and what Booth obligated himself to

convey, if we concede that the contract covers improvements in the absence of a specific covenant relating thereto. In the 21st paragraph of the agreement is the following: "Mullins agrees in consideration of Booth bringing the idea of the *sheet metal evaporator* to them for development and sale, to pay to Booth * * *." The extruded metal evaporator invention of Booth was not an improvement on the sheet metal evaporator that was Booth's earlier invention—it was a new invention and Booth was not obligated to assign to Mullins his patent thereon. To sustain a decree for specific performance, the contract not only should be clear and unambiguous, but the evidence in relation to the acts alleged to have been done under it and necessary to give it effect should be clear and convincing. Jenkins Petroleum Process Co. v. Sinclair Refining Co., D.C., 32 F.2d 247; Id., 1 Cir., 32 F.2d 252, affirmed 289 U.S. 689, 53 S.Ct. 736, 77 L.Ed. 1449, 88 A.L.R. 496. Neither in the contract nor in the attendant circumstances bearing upon the intention of the parties, is there that clarity and conviction compelling proof of Booth's obligation to justify a decree for specific performance.

■ But if we are wrong in this Mullins still must fail. The court found that there was rejection of Booth's offer of his extruded invention, whether offered under the original contract or coupled with insistence upon a new contract; that if there was a second offer it was not at any time accepted, and that there was an unexplained delay in demanding assignment for a number of years subsequent to its presentation and after it had been reduced to practice. The evidence supports the findings, and the findings, the conclusion. We recognize that this is an equity case, and that there is no conclusiveness in the lower court's decision on the controversial facts. We have given careful consideration, however, to the entire record. The court below heard and saw the witnesses, and had advantages superior to ours to determine credibility and the weight of evidence. We are unable to say that the results reached are erroneous.

■ True, it is, that courts have refused to recognize mere delay as a bar to the pursuit of an equitable remedy when there has been no disadvantage resulting to the other party from such delay. The principle asserted is so well understood that citation or discussion of authorities is un-

necessary. But the plaintiff's insistence that it is entitled to a decree for specific performance because Booth suffered no disadvantage by its failure to enforce assignment for a period of years, must be rejected. There was a controversy between the parties as to whether the new invention came within the contract. It was meritorious and not merely colorable. Mullins insisted that the new concept was within the contract—Booth contended that it proclaimed a new invention. Until that controversy was terminated, there was a cloud upon Booth's title. He could manufacture, or license others to manufacture under his application or patent, only at his peril. This is made still more clear by the appellant's present insistence that even if it does not have the legal title to the Booth invention, it has an equitable title thereto. Until the controversy was terminated, either by arbitration or litigation, Booth's rights were uncertain, and his plans for exploiting a now concededly valuable invention, hampered and delayed. True it is, also, that Booth in 1939 did do something to promote his invention, but that was only after the lapse of years had dimmed the threat to it. If Mullins did not want his invention somebody else might, and he was entitled to know, beyond peradventure, the validity of Mullins' claim to it. His disadvantage in the interim clearly appears.

The contention that during substantially the entire period of delay Booth had but an application, and so no property right to assign that Booth could demand, is, of course, not persuasive. The right of Booth to his invention while his application is pending is an inchoate right, which matures as property when the patent issues, and it may have great prospective value. It must be remembered that the entire contract, including Booth's employment by Mullins, was founded upon no greater interest in property than is represented by patent applications. Mullins' explanation for delay, based upon its aid exerted in securing the patent grants through its attorney and at its expense is likewise rejected. Booth desired to have his own patent counsel file the application, and permitted it to be done by Mullins only upon an agreement that his position that the patent did not come within the contract would not thereby be prejudiced. To this Mullins agreed, and we refuse to consider the argument that the delay was contributed to by Booth by reason of the "no prejudice" agreement.

One word more is necessary, in all fairness to the District Judge, for us to say. Repeatedly, in brief and argument, it is urged that the court below failed to give full consideration to the evidence, and to the proposed findings of fact submitted by the parties, and reiterated is the implication that, if it had, a different result would have followed. The record lends no support to this manner of presentation nor to any inference that there was departure by the court from that careful and painstaking attention to issues and proofs that, through the years, we have been led to expect from the district of adjudication under its present governance.

The decree below is affirmed.