## EASTERN MANUFACTURERS, Inc., v. COLGATE–PALMOLIVE–PEET CO.

### No. 1039.

District Court, D. Delaware.

Sept. 24, 1936.

William G. Mahaffy, of Wilmington, Del., Harold Harper (of Harper & Matthews) and Lucius E. Varney (of Emery, Booth, Varney & Whittemore), both of New York City, for plaintiff.

Hugh M. Morris, of Wilmington, Del., Mason Trowbridge, of Jersey City, N. J., Frank E. Barrows and Curt Von Boetticher, Jr. (of Pennie, Davis, Marvin & Edmonds), both of New York City, for defendant.

NIELDS, District Judge.

Bill for the establishment of a trust in a certain patent and for the assignment of the patent to the plaintiff. The bill prays: "That a decree be entered herein directing defendant to make and deliver to plaintiff an assignment in writing transferring and conveying to plaintiff the entire right, title and interest in and to the aforesaid application for letters patent of the United States Serial No. 515,412 filed February 12, 1931 and in and to the aforesaid letters patent of the United States No. 1,-918,603 dated July 18, 1933; and also perpetually enjoining and restraining defendant, its officers, agents and employees, from practicing the process described in said letters patent and from committing any acts whatsoever directly or indirectly in infringement of the same; * * *" An answer was filed denying the trust and denying that from the facts in the case the alleged trust could be construed.

There is no disagreement between plaintiff and defendant as to the vital facts of the case. They disagree over the legal effect of those facts. We are concerned, therefore, with the facts and not with the pleadings.

Colgate & Co., defendant's predecessor, in 1928 was one of the large soap manufacturing companies of the country and had been in business over a century. Its main plant was in Jersey City. It manufactured both high-grade toilet soaps and the cheaper laundry soaps and soap powders. The quality of the fat or oil or fatty acids is the prime consideration in the production of high grade soaps. The price of the oil or fat is the prime consideration in the production of the cheaper soaps. It was part of the business of Colgate & Co. as a soap manufacturer to refine inferior soap making material where the raw material could be bought cheaply. When soap is produced from natural oils and fats, glycerin is produced as a by-product. Pound for pound glycerin is much more valuable than soap. Colgate & Co. had a well-equipped laboratory to test raw materials for the manufacture of its wide range of soaps. Dr. Ittner had been chief chemist in charge of the laboratory since 1896. As oils and fats vary widely in their origin and purity, they require expert chemical analysis.

Zieley Processes Corporation was a promotion company. The men interested in it had no experience in soap making. They were financial men whose experience was along entirely different lines. Its two main lines of promotion were: (1) The production of fatty acids from petroleum; (2) the distillation of petroleum oil by the so-called high vacuum distillation process. It had a plant for experimental purposes at Garfield, N. J. The company became interested in the production of fatty acids from petroleum in 1922 through Thomas Gray, who had taken out a patent in 1915 which he assigned to the Zieley Company. This patent was the basis of its operations for a year or two. The persons who worked on the production of fatty acids from petroleum from 1921 to 1928 were Gray, Rudolph, and Solomonoff. The period is divided into the Gray period, from 1921 to 1925, and the Solomonoff period, after 1925.

In 1922 the Zieley Company considered the Gray process sufficiently developed to attempt to interest Proctor & Gamble Company in fatty acids produced by the process of that patent. There was some negotiation between Connable representing Zieley and McCaw then of Proctor & Gamble. There is no record of this negotiation. At the time of trial, Connable was not produced and McCaw was dead. Following Connable, Gray and Rudolph tried to interest McCaw in its fatty acids for the manufacture of soap. Gray and Rudolph used the precise temperatures and pressures and obtained the same degree of conversion that characterized the Solomonoff "secret process." The only respect in which the Gray process differed from Solomonoff was in the use of iron apparatus instead of a noncorrosive apparatus. This latter feature was well known and did not originate with Solomonoff. In 1927 Rudolph again talked with McCaw, who was then vice president of Colgate & Co. and general manager in charge of manufacture. Rudolph sent four samples of fatty acids to McCaw with a letter dated September 19, 1927, stating that he was specifically authorized by the Zieley Company to write the letter and send the samples. He gave the product, but not the process by which the product was made. He gave, however, the information a manufacturer requires to test samples. He concludes the letter: "We await with interest the result of your investigation of these products and would appreciate after the investigation to have the opportunity to meet your technical men for a general discussion of the matter." There is no suggestion in this letter that there was anything secret or confidential about the samples. In fact, the samples were old products which the Zieley Company claimed it could make cheaply by its process. The four samples were sent in gallon cans containing three or four pounds per can. An examination of the samples showed that the fatty acids differed from the ordinary fats and oils Colgate & Co. were using in their soap manufacture. The samples contained impurities. Colgate & Co. tried to distill off the objectionable impurities with superheated steam. They reported "the soap after this treatment has a less intense odor than that prepared from the original acid and it is not impossible that the more prolonged (than one hour) steaming may remove the objectionable odor." The investigation of Colgate & Co. showed the product had this odor long before there was any disclosure of the process.

When the Zieley Company approached Colgate & Co. in 1927 to interest it in its fatty acid process, Zieley was exploiting the Solomonoff process for producing fatty acids from petroleum. The only feature of the Solomonoff process which had not been previously carried out by Rudolph and Gray was the substitution of a noncorrosive material for the converter instead of iron. The claims presented in the Solomonoff application covering the use of a noncorrodible container were rejected by the Patent Office on prior art patents showing this feature, and they were canceled.

The Gray patent, granted in 1915 and assigned to the Zieley Company in 1925, specifies the temperature and pressure of the so-called "O" process as well as the product. Rudolph, plaintiff's expert at the trial, testified that he was familiar with the literature relating to producing fatty acids from petroleum and before December, 1927, had discussed the prior art with Varney, the patent attorney of Zieley. Dr. Ittner, chief chemist of Colgate & Co., testified that he followed the patents and literature on producing fatty acids from petroleum. He knew that during the War there was a scarcity of oils and fats and that Germany had worked on this problem. After the War he asked a friend visiting Germany to bring back a sample of soap made from petroleum. Dr. Dreger, a chemist of Colgate, had a course in organic chemistry at college in 1921 where the making of fatty acids from petroleum was covered.

In the Solomonoff "O" process, you take a petroleum product such as paraffin or scale wax, and by a chemical reaction with the oxygen of the air you combine the oxygen chemically with the hydrocarbon in the paraffin and produce fatty acids. Fatty acid is an oxidation product of the paraffin. For many years it had been known that if you take paraffin and subject it to oxidation with air at high temperature you form fatty acid. According to the representatives of Zieley, this Solomonoff process was a cheap process for carrying out that old reaction.

Early in 1928 Solomonoff filed an application for a patent stating: "It is well known that paraffin wax may be readily oxidized to produce fatty acids, esters, lactones, aldehydes, etc., by treatment with air or other free oxygen containing gases if the wax is maintained at suitable temperatures. * * * It is also known that products of the desired quality may be obtained by carrying on the treatment for a very short time, whereby only a small portion of the material being treated is oxidized, and then separating out the converted products and repeating the process, taking off a very small percentage of converted material after each successive treatment." Solomonoff then proceeds to describe his process, which he says is the commercial process for making the product. Incidentally he concedes his product was old because described in prior patents. He claims a saponification value of 90 to 150. This value was lower than the values recited in Rudolph's letter of September, 1927, to the Colgate & Co. The samples actually sent resemble the product described by Gray in his patent of 1915.

The contract between the parties to this suit was not signed until April, 1928, but its terms had been agreed upon by January of that year. There was an exchange of correspondence outlining the substance of the contract. The correspondence reflects an understanding that the only thing Zieley had were details of a process that would make the particular product cheap. There was no question of secrecy or confidence about the product. In a letter of January 5, 1928, written by McCaw of Colgate, to Warren of Zieley, there is outlined a proposed agreement along the lines of the final contract. It concludes: "In the event that we should not be interested to join with you in the development of your process on a commercial basis, we will so notify you, and we agree that we will not thereafter ourselves use or disclose to anyone else the process which you disclose to us. It is understood, however, that we are not precluded by this agreement from using other methods, if any, for the oxidation of paraffin." On the same day Varney, representing Zieley, wrote to McCaw, of Colgate, that they were waiting for the Colgate representatives to visit the Zieley laboratory and witness the Solomonoff process, and that he understood Trowbridge was to draft an agreement which would embody McCaw's ideas concerning "our joint co-operation." He concluded his letter: "But it will, of course, be understood that in the event we do not succeed in making a contract between us, the disclosure of the process to you will be regarded as strictly confidential and with the

understanding that Colgate & Company agrees not to use the same either in the form disclosed or in any improved form."

January 7, 1928, Zieley telegraphed Mc-Caw, of Colgate: "We prefer postpone consideration of contract until you have seen and understand our process and shall expect you to witness same Monday subject condition Varney Letter January five."

On January 9, 1928, McCaw, Ittner, and Robert Colgate went to the Zieley laboratory at Garfield. Solomonoff and Rudolph made a demonstration of the alleged secret process. We have the contemporaneous documentary evidence regarding this visit in the form of a report written by Dr. Ittner the same day after his return to his office. He reports the apparatus was a small laboratory apparatus about four inches in diameter and three or four feet high. It was operated at a temperature of about 300° F. and a pressure of 70 to 80 pounds. These were the temperatures and pressure used by Gray and Rudolph before Solomonoff's employment. He reported that the action proceeded until about 50 per cent. of the material was converted into acids. This also agrees with the conversion used by Gray and Rudolph before Solomonoff's employment. At this demonstration there was no discussion of the effect of temperature or pressure or of the proper limits thereof. There was no mention of Gray or of the Gray patent or of any work that Gray had done. The entire cost of the apparatus was about $100. Dr. Ittner indicated in his report that he felt that the problem of making fatty acids from petroleum would be solved. The nature of the metal used in making the converter was not disclosed, but Dr. Ittner

recognized that monel metal, then well known to be resistant to acids, was used.

After the visit to the Zieley laboratory and before the signing of the contract on April 19, 1928, additional samples were furnished by Zieley to Colgate. Investigation of their availability for soap manufacture was going on in the laboratory of Colgate. Dr. Ittner in his report of February 28, 1928, refers to discussions with Solomonoff and Rudolph, and states: "I realized then that they did not have a finished process but I have gradually and regretfully found out that there is still more unknown and to be solved than I thought at the time we visited their laboratories. In other words, their experiments have not given so many definite results as I had hoped. * * * Each day that I have talked with them I have been more and more thankful that I advised a 1000 pound unit rather than a 50,000, 10,000, or even a 5,000 pound unit because the whole thing is still very much in the exerimental stage." The work of Colgate up to this time had been to determine the nature of the samples and their suitability for soap manufacture. The investigation showed them to be an inferior material.

April 10, 1928, a 1,000-pound converter was installed. This was nine days before the contract was signed. Six months' investigation before signing the contract emphasized the fact that the contract was intended to set forth the entire agreement between Zieley and Colgate.

The contract between the parties is dated January 7, 1928, but the actual date of signing and delivering the contract is April 19, 1928. (For text of contract, see footnote.*)

* "Memorandum of Agreement made January 7, 1928, by and between Zieley Processes Corporation, a Maine corporation hereinafter referred to as *Zieley*, and Colgate & Company, a New Jersey corporation hereinafter referred to as *Colgate*.

"1. Zieley is the owner of a secret process for the production of fatty acids from paraffin, samples of which fatty acids have been submitted to Colgate; and Colgate has requested that it be given full knowledge of the process in question, to which Zieley is agreeable, the purpose of both parties being to cooperate, first, for the purpose of making these fatty acids in sufficient quantities to be made into soaps by Colgate, and second, for the erection of a plant for the commercial exploitation

of the process if the soaps shall appear satisfactory to Colgate.

"2. For this purpose, and for the period defined in paragraph 4 hereof, Zieley will furnish the services of its Chief Chemist, Ferdinand A. Rudolf, and of its consulting chemist, Dr. Andrew S. Solomonoff, and Colgate will furnish the services of its chemical staff together with all necessary laboratory and factory accommodations, heat, light, power, machinery, equipment, materials, supplies and labor at its plant at Jersey City, New Jersey.

"3. All of the foregoing shall be supplied at the expense of the party so furnishing the same, except that expenditures by Colgate for special machinery, equipment, materials and supplies purchased for said purpose and for direct la-

Paragraph 1 of the agreement starts out with the recital that: "Zieley is the owner of a secret process for the production of fatty acids from paraffin, samples of which fatty acids have been submitted to Colgate." This is a representation that there is a secret process, that Zieley owns it, and that the samples of fatty acids submitted to Colgate are samples of fatty acids produced by that process. The agreement recites that Colgate has requested information regarding the process and that Zieley is agreeable to giving it, and then states: "the purpose of both parties being to cooperate, first, for the purpose of making these fatty acids in sufficient

bor in connection therewith, and like expenditures by Zieley incurred in the discovery and development of said process (these expenditures, however, not to include the services rendered by the chemists of either party), shall be deemed to have been made for the account of Eastern Manufacturers, Inc., hereinafter described, and shall be repaid by said Eastern Manufacturers, Inc., in the manner specified in Paragraph 8 hereof.

"4. The production of fatty acids and soaps referred to in Paragraph 1 shall be carried on until such time as Colgate shall notify Zieley that it is ready to proceed with the commercial exploitation of said process as provided hereinafter; and failure to give such notice within one year from the date hereof shall be deemed an abandonment by Colgate of all rights hereunder unless Zieley shall consent to continue the period for this work.

"5. If and when Colgate shall notify Zieley that it is ready to proceed with the commercial exploitation of said process, the parties hereto will cause a corporation to be formed under the name Eastern Manufacturers, Inc., under the laws of the State of New Jersey, by the filing of a certificate of incorporation in the form attached hereto and marked Exhibit A.

"6. The stock of the original subscribers named in the certificate of incorporation shall be acquired by the corporation immediately after the filing of said certificate and thereupon the entire capital stock of said corporation shall be issued in equal parts to the respective parties to this agreement in consideration of the following:

"(1) Fifty thousand dollars ($50,000.) in cash to be paid by Colgate;

"(2) The assignment by Zieley and Colgate to Eastern Manufacturers, Inc., of all their respective rights, titles, and interest in and to said process and all other processes for the derivation of fatty acids from petroleum that each may now have or acquire in the future, subject however to the respective terms, conditions, royalties and agreements by which these processes may be held by either of the parties and which shall be assumed by and binding upon said Eastern Manufacturers, Inc.

"(3) And the undertakings of the parties hereto in this agreement contained;

"And the parties hereto will cause said stock to be so issued.

"7. Colgate shall provide all capital and/or facilities reasonably necessary for the operation of Eastern Manufacturers, Inc. Said operations may be carried on in a plant or plants to be acquired by purchase and/or construction, or to be leased, by Eastern Manufacturers, Inc., or may be carried on, by agreement between said two companies, in the plant or plants of Colgate for the account of Eastern Manufacturers, Inc. All sums advanced by Colgate, including the fifty thousand dollars ($50,000.) referred to in Paragraph 6, and all capital expenditures made by it for the account of Eastern Manufacturers, Inc., for the purposes of this paragraph, together with expenditures of both parties specified in Paragraph 3 hereof, shall be deemed loans without interest, and one-half of the net annual profits of Eastern Manufacturers, Inc., shall be applied to the repayment thereof when and as earned.

"8. Colgate shall treat all information given it by Zieley hereunder as confidential and shall never disclose the same to any person or corporation nor make use of said process, either in the form disclosed or in any improved form, for its own account.

"9. Zieley, so long as Colgate retains its interest in this agreement and keeps and performs the terms and covenants hereof, shall not divulge said process to any other person or corporation; and after the organization of Eastern Manufacturers, Inc., shall have been effected, as provided herein, Zieley shall not make use of said process for its own account.

"10. The parties hereto will execute and shall cause said Eastern Manufacturers, Inc., and their and its servants, agents and employees individually to execute such further instruments as may be necessary or appropriate to carry out the intent of this agreement.

"11. This agreement is executed by the parties hereto for and on behalf of and for the benefit of Eastern Manufacturers, Inc.

"12. Colgate shall be entitled during ninety-nine years from the date hereof to buy from Eastern Manufacturers, Inc.,

quantities to be made into soaps by Colgate, and second, for the erection of a plant for the commercial exploitation of the process if the soaps shall appear satisfactory to Colgate." In this first paragraph of the agreement there is a recognition of the distinct field of effort of soap manufacture by Colgate, and of manufacture of the fatty acids as a result of the co-operation of Zieley and Colgate, so that these fatty acids might be made available for use by Colgate. It is agreed that Zieley will furnish the services of its chemists, Rudolf and Solomonoff, and Colgate will furnish the services of its chemists, during the preliminary period of investigation until such time as Colgate shall notify Zieley that it is ready to proceed with the commercial exploitation of the process. It is agreed, in paragraph 5, that when Colgate shall so notify Zieley, the parties will cause a corporation to be formed under the name of Eastern Manufacturers, Inc., as a New Jersey corporation. The plaintiff in this suit is that corporation, formed pursuant to this provision of the contract. Paragraph 6 of the agreement provides for the issuance of stock in equal parts respectively to Zieley and to Colgate in consideration of the following:

"(1) Fifty thousand dollars ($50,000) in cash to be paid by Colgate;

"(2) The assignment by Zieley and Colgate to Eastern Manufactures, Inc., of all their respective rights, titles, and interest in and to said process and all other processes for the derivation of fatty acids from petroleum that each may now have or acquire in the future, subject however to the respective terms, conditions, royalties and agreements by which these processes may be held by either of the parties and which shall be assumed by and binding upon said Eastern Manufacturers, Inc.

"(3) And the undertakings of the parties hereto in this agreement contained."

Thus the considerations for the issuance of the stock, by virtue of which Zieley and Colgate became stockholders of the plaintiff, were that Colgate should pay $50,000 in cash; that both Zieley and Colgate should assign to Eastern all their respective rights in the said secret process, "and all other processes for the derivation of fatty acids from petroleum that each may now have or acquire in the future," and the undertakings of the parties set forth in the agreement.

Paragraph 7 of the agreement provides that Colgate is to furnish all the capital and/or facilities reasonably necessary for the operation of Eastern, and that all capital expenditures of Colgate, including the $50,000 above referred to, are to be considered loans to be repaid out of part of the profits of Eastern. This is the only paragraph of the agreement that defines the obligations of Colgate to Eastern so far as the supplying of capital or facilities is concerned. It was pursuant to this provision that Colgate in fact financed Eastern and provided facilities to Eastern to the extent of $186,000. This paragraph does not involve any obligation on Colgate's part to carry on research or development work for plaintiff. There is no other provision of the agreement that requires it. This is conceded by plaintiff in its brief that "the contract contained no provision, however, requiring Colgate to undertake to improve the process for any purpose."

The agreement provides, in paragraph 8, that Colgate shall treat information given it by Zieley as confidential and shall not disclose it "nor make use of said process, either in the form disclosed or in any improved form, for its own account." Paragraph 12 of the agreement recognizes that the field of activity of Colgate is a separate and distinct field from that of Eastern. It provides: "12. Colgate shall be entitled during ninety-nine years from the date hereof to buy from Eastern Manufacturers, Inc., for its own use and that of its subsidiary corporations, the products of Eastern Manufacturers, Inc., up to a maximum of twenty percent of its annual production, at the delivered cost of the same plus ten percent

for its own use and that of its subsidiary corporations, the products of Eastern Manufacturers, Inc., up to a maximum of twenty percent of its annual production, at the delivered cost of the same plus ten percent and its further annual requirements at the lowest current price.

"In witness whereof the parties hereto have caused these presents to be executed in duplicate in their names and their seals to be hereunto affixed by their respective officers thereunto duly empowered.

"Zieley Processes Corporation,
"By Schuyler N. Warren,
"President.
"Colgate & Company,
"By W. E. McCaw,
"Vice President."

and its further annual requirements at the lowest current price."

In this paragraph the distinct fields of endeavor of plaintiff and defendant are recognized. Defendant, as a soap manufacturer, is entitled to buy for its own use and that of its subsidiary corporations up to the specified maximum percent of the products of plaintiff. These products are clearly defined in paragraph 1 and elsewhere in the agreement, namely, the fatty acids produced by the secret process from paraffin, samples of which had been submitted to Colgate.

Thus the agreement itself, as well as the negotiations leading up to it and the circumstances surrounding its execution, indicate that it was intended to set forth the entire consideration and the entire rights and obligations of both parties thereto.

At the first meeting of the directors of plaintiff on May 11, 1928, the contract between Zieley and Colgate was ratified and the stock of plaintiff was issued, half to Zieley and half to defendant. That the agreement was accepted by all parties as controlling their relations is abundantly established. Subsequent to the opening of plaintiff's books on June 30, 1929, defendant advanced or expended for the account of plaintiff a sum of $67,801.15. Before that date defendant had advanced or expended for the account of plaintiff $118,988.55. The total amount of money which was expended by defendant for plaintiff's account was $186,789.70.

The plant of Eastern Manufacturers, Inc., was located as the contract provided in buildings set aside by defendant adjacent to defendant's plant in Jersey City. The first O-converter of about 1,000 pounds started in operation on April 10, 1928, a few days before the contract was signed. This converter was operated continuously until the large converter was built. Solomonoff had charge of it and Dreger was assigned by defendant to work with Solomonoff. The reports made by Dreger of the first 47 runs of this 1,000-pound converter are illuminating. This was the first demonstration of the process on any substantial scale. We find that in 34 of the 47 runs the saponification value of the product was considerably below the minimum of 90 alleged by plaintiff to characterize its secret process. A large converter of about 20,000 pounds capacity was constructed and operated by plaintiff about the middle of September, 1928. In November it was necessary to shut down this converter because defendant was unable to use the product for soap manufacture and all of the storage tanks were filled. Again in January, 1929, the large converter was started up and continued in operation for three or four months when it was again shut down. Since then this large converter has been idle. Every effort was made by Colgate to use the products of the large converter in its commercial soap manufacture. Early in 1929 an officer of Colgate directed that a large scale practical trial be made of the fatty acids in defendant's commercial soap manufacture. He ordered that ten successive batches of Octagon soap be made using 10 per cent. of the fatty acids of the plaintiff. The result of this commercial effort was a dismal failure. The product was not a marketable product. The quality of the soap was "soft, dark and bad odor." From the receipt of the first samples of fatty acids in September, 1927, until the attempts to produce soaps on a large scale in the spring of 1929, research and investigation was going on, both in connection with the production of the fatty acids and in connection with the manufacture of soaps from them. But all was of no avail.

For more than a year and a half beginning with the receipt of samples in September, 1927, and continuing up until the spring of 1929, the laboratory of defendant made a continuous study of fatty acids and of methods for purifying or refining them. This work was the kind of work that the laboratory of defendant was accustomed to do in the investigation of raw materials. This investigation was one of the most elaborate and comprehensive they had ever made. There was no obligation under the contract to do such work. The process which Zieley had represented as available for the manufacture of commercial fatty acids had proved to be unsuited for the lowest grades of soaps. The venture which was estimated to require $50,000 had required many times that amount and nothing had been accomplished. The elaborate investigation of fatty acids from petroleum showed them to be unlike any other soap material. From one-fourth to one-third of the acid constituents are lactones. Lactones, when treated with a solution of caustic alkali, react to form soaps of hydroxy acids. The soaps of hydroxy acids do not lather well. When this characteristic of petroleum fatty

acids was discovered, a great deal of effort was devoted by Dr. Ittner to get rid of these lactones. One of the known laboratory methods for treating lactones was the Gruen method which involved a particular heat treatment. Dr. Ittner tried this method and found it was satisfactory for converting the lactones into stable fatty acids, but that it was too expensive for commercial use. The Gruen process gave fatty acids which were capable of making soaps of good lathering qualities. Dr. Ittner said: "We devoted our thoughts to try to get a factory method to accomplish what Gruen had accomplished by this expensive laboratory method." He made soap out of the product of the converter and devised means of heating this soap to a temperature not high enough to cause decomposition, yet sufficiently high to cause the molecular water to split off from the soap. That molecular water came from the alcoholic hydroxyl and adjacent carbon, atom. He found that this method worked on soap made from the oxidation of products of gas oil although Gruen's method did not work on such products.

Dr. Ittner invented a process of producing soap and glycerin from natural fats in the fall of 1929. He explains how he came to invent this new process. The soaps from the treatment of petroleum fatty acids were very dark and he sought to ascertain whether the darkness was due to the soap or to some other constituent. His tests indicated that the darkness was due to something other than the soap. He testifies: "I will take a pure soap that does not have anything to do with this, and subject it to the treatment, so I thought of different things and of different fats, and was going to subject that to this treatment, and as I thought it over I said, 'Well, here, that is going to give glycerin,' and I had something that was different from the other process, and I thought the thing out and I said, 'Well, here glycerin is going to be formed, and I will distill that out, and at the same time I will get a soap and get glycerin,' which was not the product at all that had anything to do with the other operation."

Dr. Ittner gave orders to have several natural fatty materials treated, and he found that different natural fats and oils were saponified with the aid of high temperatures and alkalies with the resulting production from them of glycerin and soap; the glycerin distilling over at the temperature of the operation and being condensed in a substantially pure form. He says: "We recognized that it was a new way of making soap and glycerin and we made a good many soaps in that way from different natural fatty materials." The chemical reactions involved in this process are entirely different from those involved in the heat treatment of the petroleum hydroxy acid soap. This new process of Dr. Ittner was called the A-process.

In the A-process applied to the O-process you have an intermediate process. You get the crude soap by adding an alkali to the fatty acid. This involves heating the soap to a temperature so high that all water is driven off and the soap is a liquid, anhydrous soap. You then blow steam through the hot liquid soap, with the result that you bring about a profound chemical reaction which has no counterpart in the manufacture of soaps from natural oils and fats. When paraffin is oxidized by the O-process, you get many and varied by-products because the air reacts in a promiscuous way. One of the products is lactone which forms hydroxy fatty acid. Soaps from these acids have poor lathering qualities. Dr. Ittner discovered that by heating this crude soap to high temperature and blowing steam through it he could convert the hydroxy fatty acid soaps into unsaturated fatty acid soaps which are good soaps. At the same time the so-called unsaponifiables are distilled off.

The A-process has nothing whatever to do with petroleum fatty acid soaps. It is a process of making soap and glycerin from the natural oils and fats. You have different chemical reactions and you produce glycerin as a valuable product of the process. There is no glycerin in the petroleum fatty acid soaps.

The A-process and the O-process are entirely different. The O-process is carried out by blowing air to get oxidation. In the A-process air must be completely excluded. In the O-process you get the chemical reaction of converting hydrocarbons and fatty acids. In the A-process that reaction is impossible. The A-process deals with soap and results in the production of refined soap.

The A-process is the process of Ittner patent granted July 18, 1933, No. 1,918,603. This patent was issued to defendant. The relief prayed in this suit is the assignment of this patent by defendant to plaintiff.

The contract between Colgate & Co. and Zieley Company contains a clear provision respecting the obligation to assign inventions by Colgate to plaintiff. Subparagraph 2 of paragraph 6 confines the obligation to existing processes "and all other processes for the derivation of fatty acids from petroleum that each may now have or acquire in the future." Paragraph 6 provides that the stock of plaintiff shall be issued equally to Colgate and Zieley in consideration of the assignment by Zieley and Colgate to Plaintiff of all their respective rights, titles, and interest in and to "said process"; that is, to the secret process Zieley claimed it owned. Subparagraph 2 is a definite provision intended and understood to set forth the obligations of both Zieley and Colgate so far as the assignment of inventions to this plaintiff is concerned.

The production of fatty acids from paraffin is the sole object for which plaintiff was formed and for which Colgate undertook to finance it. Aside from the contract, plaintiff asserts that there was a confidential disclosure of a process which was the basis of a trust relation and because of that relation plaintiff is entitled to an assignment of the patent covering the A-process. The disclosure by Zieley was one of the considerations of the contract. Zieley has found that its whole petroleum fatty acid venture is a commercial failure. It seeks to get the Ittner patent covering the A-process which has nothing to do with a process for making fatty acids from petroleum or with making soaps from those fatty acids.

Plaintiff asserts the contract itself is a joint venture contract. In Jackson v. Hooper, 76 N.J.Eq. 592, 75 A. 568, 27 L.R.A.(N.S.) 658, the New Jersey Court of Errors and Appeals held that there cannot be a joint adventure where the adventure is incorporated. It then becomes a corporate venture. In Claude Neon Light, Inc., v. Federal Electric Co., 135 Misc. 113, 236 N.Y.S. 692, affirmed 232 App. Div. 786, 249 N.Y.S. 907, the court refers to Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1, relied on by plaintiff, and says it does not apply to a case where there is a contract between the parties defining their rights and obligations to each other and where there is a corporation in which stockholders have an interest.

Plaintiff in its reply brief shifts its ground. It no longer relies on the theory of joint adventure. It now relies on the theory of trust relation. Its position is that "the mere fact of the confidential disclosure" of the O-process, plus defendant's undertaking "to improve the process for plaintiff's benefit," is sufficient to support the relief demanded irrespective of whether Zieley and defendant were or were not joint adventurers. The Ittner invention disclosed in the A-process was in no way based on or suggested by the disclosure of the O-process. The product of the O-process was bad and produced impure, evil smelling soap. Ittner was stimulated to find some way of purifying that soap—not to improve the O-process. It was the uselessness of the product of the O-process and of the soap made therefrom which stimulated Ittner to make his invention.

The word "improvement" is not used in the contract. Even if it were, in no legal sense is the A-process an improvement of the O-process.

In Jenkins Petroleum Process Co. v. Sinclair Refining Co. (D.C.) 32 F.(2d) 247, 251, there was an agreement to assign improvements in a so-called Jenkins Process. The court in discussing the meaning of improvements said: "It is a question of what the defendant has that belongs to the plaintiff under the contract. This depends to some extent on the meaning of the word 'improvements' as used in the contract. It is my view, taking into consideration all parts of the contract and the situation of the parties at the time, that it means improvements in this particular Jenkins process, something that would cause the apparatus used in that process to function more efficiently, not an improvement in the general cracking art. An improvement 'on' the process would be a better process. This was not intended. It must be an improvement 'in' the process. It must be the same process or the same machine but working better by reason of the suggested change." ·

In American Cone & Wafer Co. v. Consolidated Wafer Co. (C.C.A.2) 247 F. 335, 336, the patentee had assigned his patent and "all improvements that may be made thereto or thereunder." The court said: "We think it clear that the purpose of the language used was not to subject every future cone baker which Groset might devise to the assignment; the improvements covered by the phrase were those to that machine, not to the art in general. * * * It is, of course, true that any improved cone baker might super-

sede that purchased by the plaintiff's predecessors, and would therefore defeat the grant. Perhaps it would have been legal to bind Groset to assign any future machine against such a possibility; we need not pass upon that question. All we say is that, if the purpose is so broad, the language must not be so vague. Groset was free to make a new cone baker, which might successfully complete with the plaintiff, so long as it was not an improvement 'to' the disclosure of his first patent."

There is no joint adventure. There is no trust requiring defendant to assign its patent to plaintiff covering the A-process. Accordingly the bill of complaint must be dismissed.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Equity Rule 70½, 28 U.S.C.A. following section 723.