832 F.2d 214
 TRIPLE-A BASEBALL CLUB ASSOCIATES, et al., Plaintiffs, Appellees,
v.
NORTHEASTERN BASEBALL, INC., Defendant, Appellant.
TRIPLE-A BASEBALL CLUB ASSOCIATES, et al., Plaintiffs, Appellants,
v.
NORTHEASTERN BASEBALL, INC., Defendant, Appellee.
TRIPLE-A BASEBALL CLUB ASSOCIATES, et al., Plaintiffs, Appellees,
v.
NORTHEASTERN BASEBALL, INC., et al., Defendants, Appellees.
International League of Professional Baseball Clubs,
Defendant, Appellant.
 Nos. 87-1239, 87-1266 and 87-1307.
 United States Court of Appeals,
First Circuit.
 Heard July 31, 1987.
Decided Oct. 13, 1987.
 
 Thomas B. Wheatley with whom John A. Hobson, Perkins, Thompson, Hinckley & Keddy, Portland, Me., John F. Wendel and Wendel & Chritton, Chartered, Lakeland, Fla., were on brief, for Northeastern Baseball, Inc. and Multi Purpose Stadium Authority of Lackawanna County.
 Keith A. Powers with whom Michael Kaplan and Preti, Flaherty, Beliveau & Pachios, Portland, Me., were on brief, for Triple-A Baseball Club Associates, Triple-A Baseball Club of Maine, Inc. and Jordan Kobritz.
 Frank A. Ray with whom Frank A. Ray Co., L.P.A., Columbus, Ohio, was on brief, for Intern. League of Professional Baseball Clubs.
 Before BOWNES, TORRUELLA and SELYA, Circuit Judges.
 BOWNES, Circuit Judge.
 
 
 1
 All parties have appealed in this diversity contract case which was tried without a jury by the district court.
 
 
 2
 The plaintiffs are: Triple-A Baseball Club, a Maine limited partnership; Jordan Kobritz, general partner of the limited partnership; and Triple-A Baseball Club of Maine, Inc., another general partner of the limited partnership, all of whose stock is owned by Kobritz. Plaintiffs will be referred to as "the partnership" and/or "Kobritz," as the reference requires.
 
 
 3
 Defendants are Northeastern Baseball, Inc. (NBI), a Pennsylvania nonprofit corporation; the Multi-Purpose Stadium Authority (MPSA) of Lackawanna County, Pennsylvania, a county and state entity; and the International League of Professional Baseball Clubs, Inc., a nonprofit corporation organized under the laws of the State of Virginia. The International League is also a third-party plaintiff.
 
 
 4
 The focus of the case is the interpretation of a written contract dated September 3, 1986, between the three plaintiffs and NBI. The district court made extensive and detailed findings of fact and rulings of law. Triple-A Baseball Club Associates v. Northeastern Baseball, Inc., 655 F.Supp. 513 (D.Me.1987). The crux of the court's opinion is its ruling that a key phrase in the contract was ambiguous and consequent nullification of the contract based on what it found from extrinsic evidence was the intent of the parties. We think this was error and hold that the plaintiffs and NBI are bound by the terms of the contract.
 
 HOW THE GAME WAS PLAYED
 
 5
 Before we step onto the playing field for this contract case, a little baseball background is necessary. Baseball is organized into Major Leagues and Minor Leagues. There are two leagues within Major League Baseball, the American League and the National League, containing a total of twenty-six Major League teams.
 
 
 6
 The Minor Leagues of Professional Baseball are organized as members under the National Association of Professional Baseball Leagues. The Minor Leagues have entered into the National Association Agreement with the Major Leagues. The Minor Leagues are divided into four classifications, Triple-A, Double-A, Single-A, and Rookie Leagues.
 
 
 7
 There are three Triple-A Leagues containing a total of twenty-six teams, one for each Major League team. One of the Triple-A Leagues is the International League, which is governed by a constitution, bylaws and rules.
 
 
 8
 There are three Double-A Leagues, also containing a total of twenty-six teams, one for each Major League team. One of the Double-A Leagues is the Eastern League, which is governed by bylaws, rules and regulations.
 
 
 9
 Since the goal of most Minor League players is to play in the Major Leagues and since the Major League teams obtain most of their players from the Minor Leagues, the Major League teams have player development contracts with Triple-A and Double-A teams. The game now begins.
 
 
 10
 John McGee was a man with a self-imposed mission. Indeed, it could be described as an obsession. He wanted to bring Triple-A Baseball to Scranton, Pennsylvania. But there were two problems. One, Scranton did not have a Triple-A franchise, that is, it did not have a right to have a Triple-A team play there. Such a franchise could be granted only by permission of the International League and the National Association of Professional Baseball Leagues, the governing body of Minor League baseball.[1] McGee's second problem was that Scranton did not have a stadium suitable for Triple-A baseball. McGee, however, was not deterred. He first convinced the county commissioners of Lackawanna County, in which Scranton is located, that a municipal corporation ought to be formed to build a stadium that would meet Triple-A requirements; MPSA was formed and McGee became its legal advisor. At about the same time, McGee and several associates from the Scranton area purchased the Double-A franchise of the Waterbury, Connecticut, Indians that was for sale. It was McGee's intent, and he so informed the directors of the Eastern League who had to approve the sale, to operate the Indians in Waterbury in 1985 and 1986 and move the team to Scranton in 1987, when the new stadium was completed. McGee made no bones about his ultimate goal of operating a Triple-A team in Scranton. NBI was formed and became the owner of the Waterbury Indians.
 
 
 11
 In his quest for a Triple-A franchise, McGee, on June 18, 1986, approached Kobritz who, through the partnership, was the major owner of the Maine Guides, a Triple-A team that played in Old Orchard Beach, Maine. McGee offered to buy the Triple-A franchise and Kobritz indicated an interest in selling. Negotiations continued through the summer. On July 30, McGee sent to Kobritz two contract drafts. One draft provided that NBI would buy the Triple-A franchise for $2.4 million, the other that Kobritz individually would buy NBI's Double-A franchise for $400,000. A check for $100,000 accompanied the drafts. Kobritz did not sign the drafts; he kept the check but did not deposit it. On August 20, Kobritz sent a proposed draft contract to McGee. Kobritz' proposal was more complicated than McGee's because he had some reluctant partners to deal with. In effect, Kobritz proposed that NBI pay $1.2 million to the limited partnership and $800,000 to the general partners. Kobritz' proposal also made the transfer of the Triple-A franchise to NBI contingent upon the transfer to the partnership of NBI's Double-A franchise.
 
 
 12
 On September 3, 1986, the partnership and NBI signed a contract which was drafted in final form by Kobritz' attorney. It provides as follows. The partnership agrees to sell its Triple-A franchise to NBI for $2.4 million. NBI agrees to sell its Double-A franchise to the partnership for $400,000. Paragraph 5 of the contract states: "In the event that the Eastern League of Professional Baseball Clubs shall refuse to approve the sale of the Double-A Baseball Franchise to Triple-A, then this Agreement shall continue in full force and effect with the following modifications: ...." The modifications made the purchase price of the Triple-A franchise $2 million payable by a deposit of $100,000 (which Kobritz already had) and $1.9 million at the closing. Paragraphs 6, 7, and 8 made the agreement subject to the approval on or before September 11, 1986, of the board of directors of NBI, the limited partners of the partnership, and the International League. All three approvals were obtained prior to September 11. Paragraph 9 states: "The transfer of the Double-A franchise is subject to the approval of the Eastern League of Professional Baseball Clubs." Paragraph 10 makes the approvals required under paragraphs 6, 7, and 8 "conditions precedent" and restates them in subparagraphs A, B, and C. It is to be noted here that, in contrast to paragraph 10, paragraph 9 does not make the approval of the sale of the Double-A franchise a condition precedent of the contract. Paragraph 11 set the closing for October 21, 1986, at Portland, Maine. Paragraph 12 provides that at the direction of NBI the partnership "shall sign a Player Development Contract with the Major League team selected" by NBI on or before September 14, 1986. On September 9, 1986, the partnership, at NBI's direction, signed a Player Development Contract with the "Phillies" of the National League, a Major League team. Paragraph 13 imposed the obligation to sign a player development contract with the Major League team selected by the partnership on NBI. This was not done because, on September 10, 1986, NBI transferred its Double-A franchise to the Eastern League.
 
 
 13
 On the same day, September 3, and at practically the same time, Kobritz individually and NBI entered into a side agreement. Kobritz handwrote the side agreement while his attorney was making final changes to the main contract. It provided: Both parties agreed "to use their best efforts to obtain Eastern League approval" of the purchase by the partnership of NBI's Double-A franchise. It was then provided that "if even after using their best efforts the Eastern League failed to approve such sale," the parties do hereby agree as follows:
 
 
 14
 1. Seller [NBI] agrees to sell to Buyer [Kobritz] and Buyer agrees to purchase from Seller the Double-A franchise currently owned by Seller for the purchase price of Five Hundred Thousand Dollars ($500,000.00) payable as follows:
 
 
 15
 Fifty Thousand Dollars ($50,000.00) per year for ten years commencing on September 30, 1987, and continuing on each September 30th thereafter to and including September 30, 1996.
 
 
 16
 2. Seller and Buyer shall enter into a consulting agreement for a period of ten years, whereby Buyer shall provide services to Seller for such ten year period. Seller shall pay Buyer Fifty Thousand Dollars ($50,000.00) per year commencing on September 30, 1987, and continuing on each September 30th thereafter to and including September 30, 1996.
 
 
 17
 The September 3 handwritten side agreement was superseded by a typewritten agreement between the same two parties, dated and executed on September 4. It contains the same provisions in the same language outlined above but has three additional paragraphs. Paragraph 3 provides:
 
 
 18
 In the event that the Eastern League denies approval both to the sale of the Double-A franchise to Triple-A Baseball Club Associates and the sale of the Double-A franchise to Buyer, Seller will reduce the amount of Buyer's consulting agreement by the amount of indemnification damages if Seller is required to pay indemnification damages to the Eastern League in connection with its acquisition of the International League Team. However, in no event shall the amount pursuant to the consulting agreement be reduced below Four Hundred Thousand Dollars ($400,000.00), payable under the same terms as set forth in paragraph 2 above, the first payment commencing on September 30, 1987.
 
 
 19
 Paragraph 4 makes the agreement contingent upon NBI's acquisition of the Triple-A franchise pursuant to the terms of the main contract. Paragraph 5 contains the superseding provision.
 
 
 20
 After being advised by McGee of the proposed sale of the Double-A franchise by NBI to the partnership, the Eastern League took the position that it had territorial franchise rights[2] to the Scranton area and refused to approve the sale. The League insisted that it would not give up its territorial claim to the Scranton area unless NBI transferred its Double-A franchise to the League. As already noted, this transfer was made on September 10, 1986. McGee and his attorney appeared in Portland on the date of the closing prepared to pay Kobritz $1.9 million. He was informed by Kobritz and his attorney that the sale of the Triple-A franchise would not be made. The game then moved to the federal district court.
 
 THE LINEUP
 Plaintiffs' Claims
 
 21
 On October 21, the day following the aborted closing, plaintiffs filed suit in federal district court against NBI asking for a declaratory judgment holding that the contract "has terminated under its own terms because of the failure of certain required conditions to occur...." On November 7, 1986, a complaint was filed by plaintiffs against the International League seeking injunctive and declaratory relief. Amended complaints against both defendants were filed on December 30, 1986.
 
 
 22
 The action against NBI has four counts. Count I seeks a million dollars in damages for NBI's alleged repudiation of the contract. Count II alleges breach of contract and damages of one million dollars. As far as we can tell, Counts I and II are essentially the same. Count III alleges that the failure of NBI to convey the Double-A team to the partnership, the failure of NBI to seek the Eastern League's approval of the transfer in good faith, and the failure of the Eastern League to take the proper action to approve or disapprove the sale of the Double-A team resulted in the termination of the contract "in accordance with its own terms"; no damages were sought under this count. Count IV alleged conversion by NBI of the plaintiffs' Triple-A franchise; the acts constituting conversion were: improperly stating and acting as though NBI possessed the Triple-A franchise and exercising rights which flow from the ownership of such franchise despite the fact that no transfer of the franchise had occurred. Consequential damages of four million dollars and an injunction were sought if the partnership's Triple-A team was unable to participate in the 1987 baseball season. We take judicial notice of the fact that this contingency has not occurred. Count V alleged breach of the September 4 side agreement, damages of two million dollars were sought.
 
 
 23
 Plaintiffs' action against the International League states five counts: I, violation of duty to operate the International League in accordance with its constitution, only injunctive relief was sought; II, oppression of and breach of fiduciary duty to a League member, four million dollars in damages were sought; III, wrongful removal of Kobritz as a director of the International League, declaratory and injunctive relief was sought; IV, tortious interference with contractual relations, damages were contingent on the partnership's Triple-A team being unable to participate in the 1987 baseball season, which did not occur; V, conversion of plaintiff's Triple-A franchise by the International League in collusion with NBI, four million dollars in damages and injunctive relief were sought.
 
 
 24
 On January 22, 1987, plaintiffs brought a complaint against MPSA alleging conversion and fraudulent transfer of the partnership's Triple-A franchise.
 
 Defendants' Counterclaims
 
 25
 NBI's counterclaim alleges: that it did not repudiate or breach the contract and asked that the Triple-A franchise be conveyed in accord with the terms of the contract (Count I); that the plaintiffs breached the contract, specific performance or damages "in excess of $10,000" were sought (Count II).
 
 
 26
 The International League brought a counterclaim and a third-party complaint against NBI and MPSA alleging four causes of action. The first sought declaratory relief that NBI and MPSA hold the League harmless from any judgment or award in favor of the plaintiffs against it. The second sought declaratory relief to the effect that any dispute between the partnership and NBI as to the ownership of the Triple-A franchise "is to be exclusively investigated and adjudicated by League, all to the exclusion of judicial intervention." The third alleged that the partnership, and/or NBI, and/or MPSA had intentionally and/or negligently interfered in the League's business relationships. Monetary damages in an unspecified amount were sought. In its fourth cause of action, the League claimed that the partnership, and/or NBI, and/or MPSA breached an express or implied contract by failing to comply with the League's constitution; damages of not less than $10,000 were sought.
 
 THE SEPTEMBER 3 CONTRACT
 
 27
 The Findings and Rulings of the District Court
 
 
 28
 The district court first ruled that Maine Law "imposes a general duty of good faith on the parties to a contract." 655 F.Supp. at 536. We think this was correct. See Reid v. Key Bank of Southern Maine, Inc., 821 F.2d 9, 12-15 (1st Cir.1987). The court then found that NBI "acted in good faith throughout the transaction with the Limited Partnership." 655 F.Supp. at 537. Based on our review of the record, we agree. We now turn to the court's interpretation of the terms of the contract.
 
 
 29
 During the trial, the court admitted, de bene, parol and documentary evidence bearing on the intent of Kobritz and McGee as to the contract of September 3 between the partnership and NBI. The court held:
 
 
 30
 The Court agrees with Plaintiffs that the September 3 main agreement is ambiguous. That agreement provided that if "the Eastern League ... shall refuse to approve the sale" of the Double-A franchise to the Limited Partnership, the agreement remained in full force and effect with the modification that the price of the Triple-A franchise would be reduced from $2.4 million to $2 million. But nowhere does the agreement define the term "refuse to approve the sale"; the parties clearly attach different meanings to this term.
 
 
 31
 655 F.Supp. at 535. The court then ruled that the evidence admitted de bene was "admissible to show the intent of the parties." Id. at 536.
 
 
 32
 Based on its consideration of the extrinsic evidence, the court found that the "only possible basis contemplated by either party for the Eastern League's refusal to approve the transfer was the existence of dissent among Kobritz' limited partners." It then went on to find that "[n]either Kobritz nor McGee had any reason to suspect that the Eastern League would refuse to consider the transfer" and that the Eastern League had refused to approve the transfer "without formal consideration of the merits of the transfer." Id. at 537. The court further found that "an implied-in-fact condition precedent of the September 3 agreement was that the Eastern League would either approve or refuse on the merits to approve the transfer of the Double-A franchise to the Limited Partnership." (Emphasis added.) The court then held: "Because this implied-in-fact condition precedent did not occur, the agreement terminated by its own terms and the Limited Partnership must return the $100,000 deposit with interest accrued thereon in accordance with paragraph 14 of the agreement." Id. at 538 (footnote omitted).
 
 
 33
 Although by rewriting the contract between the parties, the court may have arrived at what it considered a just result, we think it violated the basic principles of contract law.
 
 The Controlling Rules
 
 34
 The parties have stipulated that Maine law controls. In the area of contract law that concerns us, Maine law is similar to that of most jurisdictions. Under Maine law, deciding whether a contract clause is ambiguous is a question of law, Portland Valve, Inc. v. Rockwood Systems Corp., 460 A.2d 1383, 1387 (Me.1983), and, thus, the trial court may be reversed if its decision is erroneous, Hare v. Lumbermens Mutual Casualty Co., 471 A.2d 1041, 1044 (Me.1984). The interpretation of an unambiguous contract is also a matter of law. Century Homes, Inc. v. Plaisted, 412 A.2d 389, 391 (Me.1980) (" 'The construction of an unambiguous written contract is a question of law for the Court. An agreement, complete in itself, speaks for itself. Its meaning, the promises it makes and the duties or obligations it imposes, are questions of law for the court.' ") (quoting Zamore v. Whitten, 395 A.2d 435, 440 (Me.1978)) (citations omitted); Soper v. St. Regis Paper Co., 411 A.2d 1004, 1006 (Me.1980); cf. United Truck and Bus Service Company v. Piggott, 543 F.2d 949, 950 (1st Cir.1976) ("If the district court had only construed the written contract itself, its conclusion would be freely reviewable.") (citations omitted).
 
 
 35
 The Maine Supreme Judicial Court has described the ambiguity analysis as follows:
 
 
 36
 The issue of whether contract language is ambiguous is a question of law for the Court. The interpretation of an unambiguous written contract is a question of law for the Court; the interpretation of ambiguous language is a question for the factfinder. The interpretation of an unambiguous writing must be determined from the plain meaning of the language used and from the four corners of the instrument without resort to extrinsic evidence. Once an ambiguity is found then extrinsic evidence may be admitted and considered to show the intention of the parties. Contract language is ambiguous when it is reasonably susceptible of different interpretations.
 
 
 37
 Portland Valve, 460 A.2d at 1387 (citations omitted). See also City of Augusta v. Quirion, 436 A.2d 388, 392 (Me.1981). Extrinsic evidence should be resorted to only "when the contract language is ambiguous and that ambiguity does not disappear when examined in the context of the other provisions in the instrument." T-M Oil Co., Inc. v. Pasquale, 388 A.2d 82, 85 (Me.1978). And, "[a] contract need not negate every possible construction of its terms in order to be unambiguous." Waxler v. Waxler, 458 A.2d 1219, 1224 (Me.1983).
 
 
 38
 Maine, like most jurisdictions, disapproves of courts rewriting contracts.
 
 
 39
 Moreover, courts should not rewrite contracts, particularly agreements between two corporations acting at arms length. "We are skeptical, too, that so important a feature [as exclusive selling rights] of the franchise agreement would be so infelicitously phrased by those as astute as businessmen generally are." In the absence of any express language or any ambiguous language, which would permit the admission of relevant extrinsic evidence, reasonably indicating such a restrictive intent, the court will not lightly import meaning into a contract.
 
 
 40
 Portland Valve, 460 A.2d at 1388 (quoting Lee v. Flintkote Co., 593 F.2d 1275, 1282 (D.C.Cir.1979) (citations omitted)). See also Aroostook Valley Railroad Co. v. Bangor & Aroostook Railroad Co., 455 A.2d 431, 433 (Me.1983). We have recently commented on this very point:
 
 
 41
 "It is no appropriate part of judicial business to rewrite contracts freely entered into between sophisticated business entities." RCI Northeast Services, [822 F.2d at 205]. When the transaction is commercial, the principals practiced and represented by counsel, and the contract itself reasonably clear, it is far wiser for a court to honor the parties' words than to imply other and further promises out of thin air. We quite agree with Judge Learned Hand that, in business dealings, "it does not in the end promote justice to seek strained interpretations in aid of those who do not protect themselves." James Baird Co. v. Gimbel Bros., Inc., 64 F.2d 344, 346 (2d Cir.1933).
 
 
 42
 Mathewson Corp. v. Allied Marine Industries, Inc., 827 F.2d 850, 856 (1st Cir.1987). These principles inform our analysis of the contract.
 
 Applying the Rules
 
 43
 It is to be noted first that the contract was negotiated between two men who were both lawyers and accountants and had prior experience with the sale and purchase of Minor League baseball franchises. Neither Kobritz, who was the prime mover for the plaintiffs, nor John McGee, president of NBI, who called the shots for the defendant, were rookies. Both knew how to keep score.
 
 
 44
 Paragraph 5 is the hinge on which this case swings. It provides: "5. In the event that the Eastern League of Professional Baseball Clubs shall refuse to approve the sale of the Double-A Baseball Franchise to Triple-A, then this Agreement shall continue in full force and effect with the following modifications: ...." (Emphasis added.) We do not find the phrase "refuse to approve the sale" ambiguous. Unlike the district court, we think the term is clear and does not need to be defined. The words "refuse to approve" are only susceptible of one meaning; they mean what they say. Examining the clause within the four corners of the contract confirms its unambiguity. Paragraph 9 makes the transfer of the Double-A franchise "subject to the approval" of the Eastern League. This is but a variation on "refuse to approve." The language, as written, does not qualify or condition the grounds upon which the Eastern League could "refuse to approve" the sale; nor does it set up any formal requirements as to the form or procedure for such a refusal. The term is absolute and unequivocal--if the Eastern League did not approve the sale, the contract was to go ahead, but with altered terms.
 
 
 45
 The district court held that the parties attached different meanings to the term "refuse to approve." It then found, based on extrinsic evidence that the term had to be interpreted to mean there was an implied-in-fact condition precedent that the refusal had to be "on the merits." With due respect, we think that the phrase "on the merits" not only changes the sparse plain language of the contract, but is itself ambiguous. We cannot help but conclude that the court's interpretation of the contract was influenced by the de bene evidence which, because of the plain meaning of the contract, should have been excluded.
 
 
 46
 The plaintiffs argue strenuously that the contract was essentially a swap of franchises: "that the AA team was the essential element of consideration provided for Triple-A's [the partnership's] conveyance of the AAA franchise to NBI." Brief at 26. This contention is completely refuted not only by the terms of the contract but by documents that preceded, accompanied and followed its execution. On August 20, Kobritz sent a proposed draft of a contract to McGee. Paragraph 12 of this proposed, but not accepted, draft states: "12. The transfer of the Triple-A Baseball franchise is contingent upon receipt of the Double-A Baseball franchise in accordance with the terms and conditions of this Agreement." The executed contract contains no such provision. It does state that "the transfer of the Double-A franchise is subject to the approval of the Eastern League," but the transfer of the Triple-A franchise was not made contingent upon such approval. Paragraph 8, in contrast, makes the contract "contingent upon the approval" of the International League. Nor was the approval of the Eastern League made a condition precedent, as were the three other occurrences set forth in paragraph 10:
 
 
 47
 10. The following conditions precedent shall be required:
 
 
 48
 A. The approval of the Board of Directors of Double-A which approval shall be obtained before September 11, 1986;
 
 
 49
 B. Approval by the International League of Professional Baseball Clubs on or before September 11, 1986;
 
 
 50
 C. The approval of the Limited Partners of Triple-A on or before September 11, 1986.
 
 
 51
 Kobritz clearly knew how and when to use the terms "contingent" and "condition precedent." We can only conclude that the omission of either from paragraph 9 of the contract was intentional.
 
 
 52
 The September 3 side agreement which was executed practically simultaneously with the main contract further refutes the partnership's "swap" argument. Kobritz wrote this agreement himself. He explicitly recognized that Eastern League approval might not be obtained for the transfer of the Double-A franchise but, as in the main contract, this would not be fatal to NBI's purchase of the Triple-A franchise.
 
 
 53
 The September 4 side agreement is a further embodiment of the parties' recognition that a franchise "swap" might not occur and was not an essential ingredient of the main contract. It provided that if the Eastern League failed to approve the transfer of the Double-A franchise to either the partnership or Kobritz, Kobritz was to receive a consulting fee of not less than $400,000. Kobritz did not draft this provision. He did, however, execute the September 4 side agreement after learning that the scheduled September 6 Eastern League meeting to consider the transfer of the Double-A franchise had been cancelled. Kobritz, therefore, must have been aware that League approval was not certain.
 
 
 54
 Money, not an exchange of franchises, was the motivation for the sale of the Triple-A franchise to NBI. Under the main contract, the partnership was to be paid two million dollars; under the September 4 side agreement, which was assigned to the partnership by Kobritz, it stood to receive an additional $500,000 over a ten-year period.
 
 
 55
 The final nail in the coffin of plaintiffs' swap-of-franchise argument is a provision in the document soliciting partnership vote approval of the September 3 contract. This document, dated September 5, was drawn up by Kobritz and specifically provides in paragraph 4: "4. The Limited Partners acknowledge that the sale of the Triple-A Baseball Franchise in the International League of Professional Baseball Clubs owned by Triple-A Baseball Club Associates is not contingent upon the acquisition of the Double-A Baseball Franchise." (Emphasis added.) There was no swap of franchises provided for in the contract nor did the parties intend that there be one.
 
 
 56
 The Eastern League refused to approve the transfer of the Double-A franchise. In light of the plain language of the contract, its reasons are irrelevant. The partnership and Kobritz were contractually obligated to transfer the Triple-A franchise to NBI in accord with the terms of the contract.
 
 
 57
 The next question is the remedy to which NBI is entitled, damages or specific performance. This court can order specific performance even though the district court did not address the issue. See Laclede Gas Co. v. Amoco Oil Co., 522 F.2d 33, 38-40 (8th Cir.1975). As with the other legal issues, the law of Maine on specific performance versus damages is like that of most jurisdictions. The granting of specific performance is a matter of judicial discretion. See, e.g., Dunham v. Hogan, 143 Me. 142, 56 A.2d 550, 551 (1948); Fortin v. Wilensky, 142 Me. 372, 53 A.2d 266, 269 (1947); Jenkins Petroleum Process Co. v. Sinclair Refining Co., 32 F.2d 247, 249 (D.Me.1928), aff'd as modified, 32 F.2d 252 (1st Cir.1929). Specific performance will not be granted unless the terms of the contract are clear enough to enable a court to fashion an appropriate order. See, e.g., Fortin v. Wilensky, 142 Me. 372, 53 A.2d at 269; Jenkins Petroleum Process Co., 32 F.2d at 257 (1st Cir.). Specific performance will not be granted where there exists an adequate remedy at law. See, e.g., McIntyre v. Plummer Associates, 375 A.2d 1083, 1084 (Me.1977). The party seeking specific performance has the burden of showing that it is warranted. Cf. Oullette v. Bolduc, 440 A.2d 1042, 1046 (Me.1982) (party seeking specific performance has burden of showing a meeting of the minds); Dutch v. Scribner, 151 Me. 354, 118 A.2d 887, 888 (1955) (party seeking specific performance has burden of showing fraud or promise). The party seeking specific performance must show an attempt to tender its own full performance, see, e.g., Cobb v. Cougle, 351 A.2d 110, 113 (Me.1976), unless such tender would be futile, see A.L. Brown Construction Co., Inc. v. McGuire, 495 A.2d 794, 797-98 (Me.1985). Contracts for the sale of realty may be specifically enforced. Forbes v. Wells Beach Casino, Inc., 307 A.2d 210, 220 (Me.1973), appeal after remand, 409 A.2d 646 (Me.1979). Maine also allows specific performance on contracts for personalty, in certain circumstances. Northeast Investment Co., Inc. v. Leisure Living Communities, Inc., 351 A.2d 845, 855-56 (Me.1976) (specific performance was appropriate to enforce an oral contract to purchase stock, where the stock had no readily ascertainable market value, was not easily obtainable elsewhere, and was of special interest to the buyer).
 
 
 58
 We have been unable to find any Maine case deciding whether specific performance is appropriate with respect to the sale of a franchise. The few courts that have addressed this issue have all decided that specific performance was appropriate. See Specific Performance of Agreement for Sale of Private Franchise, 82 A.L.R.3d 1102 (1978).
 
 
 59
 In DeBauge Brothers, Inc. v. Whitsitt, 512 P.2d 487, 489 (Kan.1973), the Supreme Court of Kansas explained its holding in favor of specific performance:
 
 
 60
 Plaintiff had no adequate remedy in money damages since the real and personal properties to be conveyed were unique and were not available to plaintiff from any other source.... Franchises are by their very nature unique and exclusive, which is the source of their value to the possessor.
 
 Similarly, a Florida court has stated:
 
 61
 Sale of businesses including franchises and good will have frequently been the subject of specific enforcement in equity. 49 Am.Jur. 151. Also see Annotation in 152 A.L.R. 4. The reasons advanced decreeing specific enforcement are that franchises and good will of a business or the value of a going business and profits involved cannot be ascertained and the estimation of value would be so indefinite recovery would not furnish a complete and adequate remedy at law. Chamber of Commerce v. Barton, 195 Ark. 274, 112 S.W. 619; Garbar v. Siegel, 194 Misc. 966, 87 N.Y.S. 597.
 
 
 62
 Hogan v. Norfleet, 113 So.2d 437, 439 (Fla.Dist.Ct.App.1959). See also Cochrane v. Szpakowski, 49 A.2d 692, 694 (Pa.1946) (sale of restaurant and retail liquor license may be specifically enforced where no suitable substitute exists).
 
 
 63
 The Restatement (Second) of Contracts (1981) focuses on the adequacy of a remedy at law. Comment c to Sec. 360(b) states:
 
 
 64
 There are many situations, however, in which no suitable substitute is obtainable, and others in which its procurement would be unreasonably difficult or inconvenient or would impose serious financial burdens or risks on the injured party.... If goods are unique in kind, quality or personal association, the purchase of an equivalent elsewhere may be impracticable, and the buyer's "inability to cover is strong evidence of" the propriety of granting specific performance. Comment 2 to Uniform Commercial Code Sec. 2-716.
 
 
 65
 5A Corbin on Contracts Sec. 1142 at 117 (1964 & Supp.1982) is to the same effect:
 
 
 66
 Among the factors to be considered in granting a decree for specific performance, the most important seem to be the following: difficulty and uncertainty in determining the amount of damages to be awarded for the defendant's breach; ... [and] the insufficiency of money damages to obtain the duplicate or the substantial equivalent of the promised performance, either because the subject matter is unique in character and cannot be duplicated or because the obtaining of a substantial equivalent involves difficulty, delay, and inconvenience....
 
 
 67
 Although the Uniform Commercial Code, adopted by Maine, is not implicated, we think section 2-716 of the Code is a helpful analogy. It states:
 
 
 68
 "(1) Specific performance may be decreed where the goods are unique or in other proper circumstances." Me.Rev.Stat.Ann. tit. 11, Sec. 2-716(1) (1964). The Maine comment to this section states that it is intended to "broaden[ ] the rule" as compared to its predecessor section in the Uniform Sales Act. The pertinent Uniform Commercial Code comments to this section state:
 
 
 69
 2. In view of this Article's emphasis on the commercial feasibility of replacement, a new concept of what are "unique" goods is introduced under this section.... The test of uniqueness under this section must be made in terms of the total situation which characterizes the contract.... However, uniqueness is not the sole basis of the remedy under this section for the relief may also be granted "in other proper circumstances" and the inability to cover is strong evidence of "other proper circumstances".
 
 
 70
 The emphasis on ability to "cover" as a major criterion in deciding the appropriateness of specific performance is also found in the leading case of Laclede Gas Co. v. Amoco Oil Co., 522 F.2d at 40, where the court ordered specific performance because, in part, "there was uncontradicted expert testimony that Laclede probably could not find another supplier of propane willing to enter into a long-term contract such as the Amoco agreement...."
 
 
 71
 We think the facts of this case bring it well within the ambit of the rules requiring specific performance. The contract's terms are unambiguous; there is no problem in drafting a clear order. NBI showed its ability and willingness to perform on the closing day and presented convincing evidence of its inability to purchase another Triple-A team. The same factors that impelled specific performance of the sale of corporate stock in Northeast Invest. Co., Inc. v. Leisure Liv. Com., Inc., 351 A.2d at 855-56, are present here: the Triple-A franchise has no readily ascertainable market value, it cannot be easily obtained from other sources, and it is of special interest to NBI.
 
 
 72
 There can be no doubt that what NBI sought, a Triple-A franchise, was unique. Nor can it be gainsaid that money damages, even if ascertained, could not "obtain the duplicate or the substantial equivalent of the promised performance...." 5A Corbin on Contracts Sec. 1142 at 117. The Restatement, Corbin, the Uniform Commercial Code, and the pertinent case law strongly favor specifically enforcing contracts where the subject of the contract is unique and cannot be duplicated.
 
 
 73
 Plaintiffs argue: (1) the franchise cases are inapposite because NBI already has a (Double-A) franchise, and (2) damages are quantifiable, hence an adequate remedy at law exists. The first argument is way off base. As this case illustrates, there is a significant difference between a Triple-A and Double-A franchise. Triple-A baseball teams, generally speaking, are superior in quality to Double-A teams and the caliber of the play is consequently higher. Triple-A is the last rung of the baseball ladder leading to the "Majors." The difference between a Triple-A and Double-A franchise is evidenced in this case by the dissent in the partnership over the proposed change from a Triple-A to a Double-A team, by the different stadium requirements of the two Leagues, and especially by the dramatic difference in price for the two teams set in the contract. That NBI has a Double-A franchise is simply not relevant. As to damages, Plaintiffs only offer an amount for the year 1987, based on the difference in profits between a Triple-A team and a Double-A team for that year. This formulation does not take into account the difference in location or facilities. Nor do plaintiffs discuss how to measure future lost profits or how to compensate NBI for any added expenses it will incur in obtaining a Triple-A team in the future--assuming one becomes available for purchase.
 
 
 74
 We have considered plaintiffs' other arguments on this issue and find them without merit.
 
 THE SEPTEMBER 4 SIDE AGREEMENT
 
 75
 The side agreement provides that NBI and Kobritz will use "their best efforts" to obtain Eastern League approval of the purchase by the partnership of NBI's Double-A franchise. Although the side agreement is less than clear and does not particularly describe its relationship to the September 3 main agreement, its net effect appears to be to provide for alternate solutions to the Double-A franchise problem. If, despite NBI's and Kobritz' best efforts, the League failed to approve a sale to the partnership, then Kobritz would undertake to purchase the franchise for $500,000 and NBI would pay Kobritz a consulting fee of $500,000 (paragraphs 1 and 2). The third paragraph then provides that if the Eastern League fails to approve the sale to either the partnership or to Kobritz, Kobritz will, nevertheless, receive a consulting fee of $500,000, payable in $50,000 annual installments.
 
 
 76
 Since the district court had nullified the September 3 contract because of the failure of an implied condition precedent, it consistently held that this "excused NBI's duty to perform the obligations created by the September 4 side agreement and Plaintiffs cannot recover on that agreement." 655 F.Supp. at 540. The court also found the side agreement ambiguous because "it refers to 'best efforts to obtain Eastern League approval' and to the possibility that 'the Eastern League shall fail to approve the purchase' or may 'den[y] approval.' " Id. at 536. Although recognizing that it was not required to do so, the court, nevertheless, found that "NBI did not use its best efforts to obtain Eastern League approval of the transfer." Id. at 540. Despite the fact that, under the agreement, the use of "best efforts" was imposed on both parties, the court made no findings as to what efforts, if any, Kobritz made.
 
 
 77
 We turn to the case law to determine what requirements "best efforts" imposes. We first note that the "best efforts" standard has been held to be equivalent to that of good faith. In construing a "best effort" obligation under the Maine Uniform Commercial Code, Sec. 2-306, we stated:
 
 
 78
 We recognize that the good faith obligation is not the same for a requirements contract and an exclusive dealing contract. Under a requirements contract the obligation is to use good faith in determining requirements. The good faith obligation under an exclusive dealing contract is for the seller to use "best efforts to supply the goods and the buyer to use best efforts to promote the sale." See Kubik v. J. & R. Foods of Oregon, Inc., 282 Or. 179, 577 P.2d 518, 520 (1978).
 
 
 79
 Gestetner Corporation v. Case Equipment Company, 815 F.2d 806, 811 (1st Cir.1987). In Western Geophysical Co. of America, Inc. v. Bolt Associates, Inc., 584 F.2d 1164, 1171 (2d Cir.1978), the court interpreted the phrase "to use its best efforts to promote worldwide licensing and use" as requiring "active exploitation in good faith." We have been unable to find any case in which a court found, as here, that a party acted in good faith but did not use its best efforts.
 
 
 80
 The standard, whether it is expressed in terms of good faith or best efforts, cannot be defined in terms of a fixed formula; it varies with the facts and the field of law involved. In a case involving the use of "best efforts" to register stock with the Securities and Exchange Commission, the Second Circuit stated: "Due to the nature of the securities business and the vagaries of the SEC, registration can never be guaranteed, but in the usual case a 'best efforts' clause is as close to a guarantee of registration as any careful seller is willing to give." Lipsky v. Commonwealth United Corporation, 551 F.2d 887, 896 (2d Cir.1976). The Second Circuit has also held that "best efforts" does not strip the promising party of its "right to give reasonable consideration to its own interests." Bloor v. Falstaff Brewing Corporation, 601 F.2d 609, 614 (2d Cir.1979).
 
 
 81
 Breach of a "best efforts" duty has been found where the promisor ceased performance, United Roasters, Inc. v. Colgate-Palmolive Co., 649 F.2d 985, 990 (4th Cir.1981), cert. denied, 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981), or engaged in a number of misfeasances and nonfeasances. Bloor v. Falstaff Brewing Corp., 601 F.2d at 614. But where the promisor encountered difficult problems in carrying out the terms of the contract, no breach of the "best efforts" clause was found. Western Geophysical Co. v. Bolt Associates, 584 F.2d at 1171-72.
 
 
 82
 We now turn to the "best efforts" facts, relying mainly on the findings of the district court.
 
 
 83
 The main obstacle to approval of the transfer was that if the Eastern League agreed to permit NBI to "elevate" (leave the Double-A League and join the Triple-A League), it would lose both the NBI club and the territory in which the club played. The NBI Double-A team had originally played in Waterbury, Connecticut, but was to move to Scranton in 1987. There was a dispute as to whether the Eastern League had any territorial rights in Scranton. The Eastern League maintained that it did and must be compensated for its loss. McGee was aware of the Eastern League's position on July 15, 1985. On that date, an indemnification committee was formed to make recommendations on what indemnification to seek if NBI elevated; McGee was appointed one of the members. When McGee informed Charles Eshbach, president of the Eastern League, on August 29, 1986, that NBI had made a tentative agreement with the partnership and Kobritz, Eshbach told McGee the committee would have to consider the indemnification issue. McGee then resigned from the committee because of the conflict of interest and another member was appointed in his place. At this time, Kobritz also called Eshbach, who told Kobritz that he would call a special meeting, probably on September 6, at which Kobritz could make a presentation to the League and the League would then vote on transfer.
 
 
 84
 Both the International League and the National Association (the governing body of Minor League baseball) also rendered informal opinions on the Scranton territorial issue. International League president Harold Cooper indicated to McGee at the end of August that, in his view, Scranton was open territory. John Johnson, president of the National Association, was of the contrary opinion. McGee telephoned Johnson on September 8 and was informed that he did not believe that special action would be required to make Scranton an Eastern League territory. Johnson further told McGee that he was sure authority to force relinquishment of the Double-A franchise to the Eastern League could be found in the National Association Agreement. According to McGee, Johnson made it clear that he was judge and jury on the issue.
 
 
 85
 On September 4, the Eastern League Indemnification Committee met by conference call. The members were unanimously opposed to permitting NBI, by now considered a Scranton club, to elevate to Triple-A; they were reluctant to lose the new stadium that was to be built as well as the territory itself. The members determined that only if NBI relinquished its Double-A franchise to the Eastern League as indemnification for the League's loss would the League approve elevation. Relinquishment as indemnification had never before been required.
 
 
 86
 McGee was advised of the committee's decision on September 6. By September 7, Eshbach had obtained approval of the relinquishment condition from all Eastern League directors. McGee countered with two offers: (1) $250,000 and an agreement not to dispute that Scranton was Eastern League territory or the amount of indemnification, or (2) an agreement to permit the National Association to determine the territorial rights regarding Scranton but not the amount of the indemnification, and to pay the Eastern League $100,000 regardless of whether Scranton were found to be Eastern League territory. Eshbach reported this offer to the Indemnification Committee on September 8. The committee instructed Eshbach to advise McGee the Eastern League's position was not negotiable.
 
 
 87
 McGee met with Eshbach on September 8 and offered to discuss other alternatives to relinquishment. This offer was rejected. He also asked whether the Eastern League would approve the Double-A transfer if the National Association were to determine Scranton was not Eastern League territory. Eshbach replied that he could not guarantee such approval since other locations were more attractive than Maine to the Eastern League.
 
 
 88
 On August 31, McGee had been informed by Cooper, president of the International League, that the League would not approve the Triple-A franchise transfer to NBI if a dispute with the Eastern League was pending. McGee also faced two other obstacles: (1) in order to obtain the public financing to purchase the Triple-A franchise, it was necessary to furnish an opinion letter that no litigation was pending against NBI; and (2) the need to sign a player development contract between the Triple-A Maine Guides and the Major League Philadelphia Phillies as soon as possible.
 
 
 89
 On September 9, prior to the meeting of the International League, McGee telephoned Eshbach and agreed to release NBI's Double-A franchise to the Eastern League. McGee then informed Kobritz of the relinquishment and said he would attempt to make a cash settlement. McGee explained to Kobritz that he had agreed to relinquish the franchise in order to get Scranton open in time for the International League meeting.
 
 
 90
 Kobritz and McGee both attended the International League meeting. Nothing was said at the meeting by either about the relinquishment of NBI's Double-A franchise to the Eastern League. The International League formally approved the assignment of the partnership's Triple-A franchise to MPSA. The transfer to MPSA rather than NBI was at McGee's specific request.
 
 
 91
 The facts, no matter how interpreted, point to one indisputable conclusion: Kobritz made little effort[3] to obtain Eastern League approval of the transfer of the Double-A franchise to the partnership. We need not, however, decide, as NBI urges, that this estops the plaintiffs from asserting a "best efforts" violation by NBI. We think that the court applied an impermissibly high "best efforts" standard to McGee's attempt to obtain approval of the franchise transfer.
 
 
 92
 The court found that McGee did use his best efforts to induce the Eastern League to accept a cash settlement, but held that he did not use his best efforts "to negate the other factors that led him to relinquish the franchise." 655 F.Supp. at 540.
 
 
 93
 The court found McGee should have inquired more fully how the Eastern League directors felt about the merits of the transfer to Maine, requested an extension of the closing date to obtain time to seek formal National Association review of the issue of the Eastern League's rights in Scranton, examined the National Association Agreement to determine whether relinquishment could actually be forced as indemnification, or sought conditional International League approval of the transfer of the Triple-A franchise to NBI. Id. at 541-42. This ignores the time constraints facing McGee and the unanimous position of the Board of Directors that its relinquishment demand and refusal to approve the transfer of the franchise was "not negotiable."
 
 
 94
 We accept the court's findings as to what actually occurred, but we reject as clearly erroneous its speculation as to what other steps McGee should have taken. We have found no cases, and none have been cited, holding that "best efforts" means every conceivable effort, which is the import of the district court's ruling on this issue.
 
 
 95
 We hold, applying the proper standard, that McGee did use his "best efforts" to obtain approval of the franchise transfer. Although, as has already been pointed out, Kobritz made little effort, we do not think this is sufficient for finding a breach of the agreement by Kobritz. There are two reasons for our conclusion. First, McGee accepted without objection the burden of attempting to obtain Eastern League approval. Second, NBI has not asked that the September 4 side agreement be cancelled. Kobritz, therefore, has a consulting contract with NBI for $500,000 payable in ten annual installments of $50,000 each.[4]
 
 THE OTHER ISSUES
 
 96
 Two other issues are raised by the plaintiffs as appellants, conversion and a claim for damages against the International League. The plaintiffs claim that NBI and MPSA converted their property by exercising the rights and privileges of membership in the International League without a conveyance. Plaintiffs also argue that they are entitled to damages from the International League because of its failure to act in accordance with its constitution.
 
 
 97
 Because of our prior findings and rulings, these issues are no longer viable. We are constrained to add that, if we had to reach these issues on the merits, we would affirm the findings and rulings of the district court.
 
 CONCLUSION
 
 98
 We reverse the district court on the September 3 and September 4 contracts and uphold both.
 
 
 99
 A specific performance decree shall issue from the district court ordering that, upon payment of two million dollars, Triple-A Baseball Club Associates shall forthwith convey all of its right, title and ownership in its baseball franchise in the International League to Northeastern Baseball, Inc. If there have been any changes in ownership of the Triple-A franchise since the inception of this case, the decree shall be worded so as to reflect such changes.
 
 
 100
 The first payment under the September 4 contract shall be made at the same time as the International League franchise is transferred to Northeastern Baseball, Inc., which shall be the starting date for the annual payments.
 
 The following Judgment Order shall issue:
 
 101
 Judgment for Northeastern Baseball, Inc., in the actions against it by plaintiffs.
 
 
 102
 Judgment for Multi-Purpose Stadium Authority in the action against it by plaintiffs.
 
 
 103
 Judgment for Northeastern Baseball, Inc., on its counterclaim for specific performance against plaintiffs.
 
 
 104
 Judgment for the International League in the action against it by plaintiffs.
 
 
 105
 The cross-claims of the International League against Northeastern Baseball, Inc., and Multi-Purpose Stadium Authority seeking contribution and indemnification are dismissed as moot.
 
 
 106
 Reversed in Part, Affirmed in Part. Remanded for an entry of a specific performance decree in conformity with this opinion.
 
 
 107
 Costs awarded to Northeastern Baseball, Inc.
 
 
 108
 No costs in the actions against and for International League of Professional Baseball Clubs.
 
 
 
 [1]
 For those not familiar with the Great American Game, we point out that professional baseball has had a long-standing exemption from the antitrust laws. Flood v. Kuhn, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972); Toolson v. New York Yankees, Inc., 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953); Federal Baseball Club v. National League, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922)
 
 
 [2]
 A franchise territory consists of the municipality in which the team is located plus an area of ten miles in all directions from the municipality's limits
 
 
 [3]
 Kobritz made two telephone calls, one to Eshbach and one to McGee, inquiring as to why the September 6 meeting had been cancelled
 
 
 [4]
 We are aware that Kobritz assigned this contract to the partnership. The agreement to provide consulting services would, however, remain a personal obligation of Kobritz